STATE OF NORTH CAROLINA v. EDGAR EARL MIZE

No. 662A84

(Filed 18 February 1986)

**Homicide § 28.1 — first degree murder — self-defense — refusal to instruct — no error**

> The trial court did not err by refusing to submit self-defense to the jury
> in a prosecution for first degree murder where defendant undeniably was the
> aggressor in the final confrontation when he went to the victim's trailer at
> about 3:00 a.m., woke him, and shot him to death; virtually all the evidence
> presented at trial indicated that defendant went to the trailer armed and with
> murderous intent; witnesses testified that defendant told them of his plans to
> kill the victim immediately before going to the victim's trailer; and defendant
> testified that he believed it necessary to kill the victim before the victim killed
> him. Defendant would not even be entitled to the doctrine of imperfect self-
> defense because he was the aggressor with murderous intent in the fatal con-
> frontation.

DEFENDANT appeals as of right under N.C.G.S. § 7A-27(a)
from judgment of *Gaines, J.,* entered at the 20 August 1984
Criminal Session of GASTON County Superior Court imposing a
life sentence upon defendant's conviction of first degree murder.

*Lacy H. Thornburg, Attorney General, by Christopher P.
Brewer, Assistant Attorney General, for the state.*

*Adam Stein, Appellate Defender, by Robin E. Hudson, As-
sistant Appellate Defender, for defendant appellant.*

EXUM, Justice.

The only question presented on appeal is whether the trial
court erred in not submitting the defense of self-defense to the
jury pursuant to defendant's request. We hold there is no
evidence of self-defense and the trial court properly denied the re-
quest.

The evidence presented at trial tended to show that the
defendant, Edgar Earl ("George") Mize, and the victim, Joe
McDonald, had been friends for several years until a disagree-
ment arose concerning payment McDonald owed Mize for some
tree cutting work they had done together. Relations between the
two deteriorated further on 31 March 1984, the Saturday evening
before the killing. On that evening Kathy Haney, McDonald's live-
in girlfriend, was visiting neighbors Darryl Craven and Ruth

Smith in the trailer park where they all lived. Mize and another woman, Diane Pennington, were also present. The group sat around for several hours talking, drinking beer, and using cocaine until McDonald, angry that Mrs. Haney was not at home, appeared at the door and demanded that she return to their trailer with him. After a brief argument Mrs. Haney agreed to go, but on her way out asked Mize and Mrs. Pennington to follow her to her trailer because she feared McDonald would beat her up as he had done before. Her fears turned out to be well founded, as she and McDonald got into a physical struggle in the bedroom of their trailer. Mize burst into the room with a pocketknife drawn to break up the fight and McDonald cut his hand trying to take the knife away.

After this altercation Mize left with Kathy Haney and drove her to a nearby convenience store and then on to her mother's house. They decided not to stop there because they noticed McDonald's truck in the yard, so they rode around awhile and smoked marijuana. Mize then parked the car on a dirt road where he and Kathy Haney engaged in sexual relations. The two parties' testimony conflicted on whether it was consensual, with Mize denying Mrs. Haney's claim that he had threatened her with a knife and raped her.

Apparently Mrs. Haney related her version of the sexual encounter to McDonald, thus increasing his enmity for the defendant. As a result, on 3 April 1984 Mrs. Haney accompanied a furious Joe McDonald to the mill where both McDonald and Mize worked so they could confront Mize. Mize, however, had gone home early because having heard McDonald was "out to get" him, he was too nervous and upset to work. After he returned home, Mize began drinking with his father and two of his brothers. Over a several hour period, he consumed half of a fifth of vodka, several beers, and injected himself with the powder from nine Percodan pills, a pain reliever of mid-range potency. While Mize was in a bedroom in the rear of the house injecting himself with Percodan, he heard Joe McDonald, his brother Matt McDonald, Kathy Haney, and Steve Page outside the house looking for him. He also heard them yelling at Joe McDonald to get the bumper jack, which McDonald used as a weapon. Finally, Mize's sister and grandmother told the group to leave. Mize then took some "nerve pills" and "lost track of himself for awhile."

Mize later went to Darryl Craven and Ruth Smith's trailer next to McDonald's trailer. He was still drinking beer and carried his shotgun with him. Darryl Craven testified that Mize repeatedly expressed his intention to go next door and kill Joe McDonald after Mize finished drinking his beer. Ruth Smith and Craven also testified Mize told them he had taken Percodan and drunk beer so it would appear he had committed the murder because he was on drugs. Five minutes after Mize left, Craven heard four shots. Mize returned and told Craven to "[t]ell Ruth I got him."

Mize testified concerning his activities after leaving Darryl Craven's trailer early in the morning of 4 April 1984. He went to McDonald's trailer, knocked on the door, and hid underneath the trailer, holding the shotgun with the safety off. When McDonald went to the front door and asked who was there, Mize did not respond. McDonald then started back to the bedroom but Mize knocked again, this time on the back door. When McDonald opened the back door a crack, Mize rolled out from underneath the trailer, shotgun in hand, and fired three times through the door. Mize then took a shell out of his pocket, pushed the door open and saw McDonald lying there. Before firing a fourth shot which struck McDonald in the left leg, Mize said to him, "Are you dead, [obscenity omitted]? Are you dead?" Mize said he did not aim the shotgun to kill McDonald.

On cross-examination Mize admitted that he was not aware of any guns McDonald kept in the trailer, and that McDonald never directly threatened to kill him. All the threats Mize had heard were reported by others. When Mize fired the shots he did not see any weapons in McDonald's possession, but stated that McDonald could have been holding his knife. Nevertheless, Mize testified he killed McDonald "because he was out to kill me," despite his apparently contradictory testimony that he was not aiming the gun to kill McDonald.

Defendant presented witnesses who testified to his good character, to the friction between the victim and Mize, to the victim's violent acts on the evening before his death and to Mize's nervousness at the mill earlier that day. Defendant also offered the testimony of a psychiatrist regarding the effects of the drugs he (Mize) had taken on the night he killed McDonald. In the psychiatrist's opinion, the Percodan likely made Mize more aggressive and the alcohol diminished his capacity for reasoning and

judgment, thus intensifying defendant's fear. Without the influence of drugs and alcohol, the psychiatrist testified, Mize probably would have beaten up McDonald but would not have killed him.

The defendant requested the court to instruct the jury on self-defense, but the court refused. Mize was convicted of first degree murder and sentenced to life imprisonment. He requests a new trial based on the trial judge's failure to instruct the jury on self-defense.

The sole issue in this case is whether, viewing the facts in the light most favorable to defendant, the evidence at trial was sufficient to invoke the doctrine of self-defense and support a jury instruction on that doctrine. *State v. Montague*, 298 N.C. 752, 259 S.E. 2d 899 (1979). We answer in the negative, affirming Judge Gaines' decision, and hold that defendant's sole assignment of error is without merit.

A defendant is entitled to an instruction on perfect self-defense as an excuse for a killing when it is shown that, at the time of the killing, the following four elements existed:

(1) it appeared to defendant and he believed it to be necessary to kill the deceased in order to save himself from death or great bodily harm; and

(2) defendant's belief was reasonable in that the circumstances as they appeared to him at the time were sufficient to create such a belief in the mind of a person of ordinary firmness; and

(3) defendant was not the aggressor in bringing on the affray, i.e., he did not aggressively and willingly enter into the fight without legal excuse or provocation; and

(4) defendant did not use excessive force, i.e., did not use more force than was necessary or reasonably appeared to him to be necessary under the circumstances to protect himself from death or great bodily harm.

*State v. Bush*, 307 N.C. 152, 158, 297 S.E. 2d 563, 568 (1982) (quoting *State v. Norris*, 303 N.C. 526, 530, 279 S.E. 2d 570, 572-73 (1981)).

*State v. Wallace*, 309 N.C. 141, 147-48, 305 S.E. 2d 548, 552-53 (1983).

Our cases note further:

> On the other hand, if defendant believed it was neces-
> sary to kill the deceased in order to save herself from death
> or great bodily harm, and if defendant's belief was reasonable
> in that the circumstances as they appeared to her at the time
> were sufficient to create such a belief in the mind of a person
> of ordinary firmness, but defendant, although without mur-
> derous intent, was the aggressor in bringing on the difficulty,
> or defendant used excessive force, the defendant under those
> circumstances has only the *imperfect right of self-defense*,
> having lost the benefit of perfect self-defense, and is guilty at
> least of voluntary manslaughter.

*State v. Wilson*, 304 N.C. 689, 695, 285 S.E. 2d 804, 808 (1982) (quoting *State v. Norris*, 303 N.C. at 530, 279 S.E. 2d at 573) (cita-
tions omitted).

An imperfect right of self-defense is thus available to a de-
fendant who reasonably believes it necessary to kill the deceased
to save himself from death or great bodily harm even if defendant
(1) might have brought on the difficulty, provided he did so *with-
out* murderous intent, and (2) might have used excessive force.
Imperfect self-defense therefore incorporates the first two re-
quirements of perfect self-defense, but not the last two. *State v.
Wallace*, 309 N.C. at 149, 305 S.E. 2d at 553, *citing State v. Bush*,
307 N.C. at 159, 297 S.E. 2d at 568. Murderous intent means the
intent to kill or inflict serious bodily harm.

> 'If . . . one brings about an affray with the intent to take life
> or inflict serious bodily harm, he is not entitled even to the
> doctrine of imperfect self-defense; and if he kills during the
> affray he is guilty of murder. "[I]f one takes life, though in
> defense of his own life, in a quarrel which he himself has com-
> menced with intent to take life or inflict serious bodily harm,
> the jeopardy into which he has been placed by the act of his
> adversary constitutes no defense whatever, but he is guilty
> of murder. But, if he commenced the quarrel with no intent
> to take life or inflict grievous bodily harm, then he is not ac-
> quitted of all responsibility for the affray which arose from

his own act, but his offense is reduced from murder to man-slaughter." *State v. Crisp* . . . 170 N.C. at 793, 87 S.E. 2d at 515.'

*State v. Wetmore*, 298 N.C. 743, 750, 259 S.E. 2d 870, 875 (1979), *citing State v. Potter*, 295 N.C. 126, 144, n. 2, 244 S.E. 2d 397, 409, n. 2 (1978).

Applying these principles to the instant case, we hold that defendant presented no evidence at trial to warrant a jury instruction on perfect or imperfect self-defense. Mize undeniably was the aggressor in the final confrontation when he went to McDonald's trailer at about 3 a.m., woke him, and shot him to death. Virtually all the evidence presented at trial indicated that Mize went to McDonald's trailer armed and with murderous intent. Darryl Craven and Ruth Smith testified Mize told them of his plans to kill McDonald immediately before going to McDonald's trailer. Mize himself testified he believed it necessary to kill McDonald before McDonald killed him. Under North Carolina law as outlined above, Mize would not even be entitled to the doctrine of imperfect self-defense because he was the aggressor with murderous intent in the fatal confrontation. *See, e.g., State v. Wetmore*, 298 N.C. 743, 259 S.E. 2d 870; *State v. Potter*, 295 N.C. 126, 244 S.E. 2d 397.

Several of the cases already cited arose from situations similar to the one at bar. Here, although the victim had pursued defendant during the day approximately eight hours before the killing, defendant Mize was in no imminent danger while McDonald was at home asleep. When Mize went to McDonald's trailer with his shotgun, it was a new confrontation. *See, e.g., State v. Wilson*, 304 N.C. at 695, 285 S.E. 2d at 808 (defendant, after a fistfight with the victim who then threatened to kill defendant, went home to get a pistol, returned to the scene of the initial fight and shot victim, who was unarmed, in the back). Therefore, even if Mize believed it was necessary to kill McDonald to avoid his own imminent death, that belief was unreasonable. *See, e.g., State v. Wallace*, 309 N.C. 141, 305 S.E. 2d 548 (no evidence that defendant, who testified he shot his unarmed girlfriend in self-defense, was afraid of or vulnerable to victim); *State v. Bush*, 307 N.C. 152, 297 S.E. 2d 563 (defendant, 20-year-old Marine, stabbed unarmed 65-year-old man who was yelling at him to leave but was standing between defendant and the door).

Our decision in *State v. Norris*, 303 N.C. 526, 279 S.E. 2d 570 (1981), upon which defendant mistakenly relies, can be distinguished easily from the present case. In *Norris*, the defendant waited outside the trailer where the victim, her recently estranged husband, lived with his girlfriend. She intended only to ask him for money, but he began cursing, threatening, and beating her, breaking her nose and knocking her to the ground. When defendant got up, her husband was coming towards her. The victim, a heavy drinker, had abused defendant physically during their marriage. The victim's girlfriend also came out of the trailer. Defendant, afraid that if they both got to her she would be killed, shot her husband as he came towards her. We held the jury should have been instructed on imperfect self-defense, and ordered a new trial for defendant on the grounds that (1) she sought out the victim *without* murderous intent and (2) reasonably believed it necessary to kill him to avoid serious bodily injury because of her husband's history of brutality towards her, and because she was outnumbered. In the present case, although defendant heard indirectly of threats from the victim, the latter had neither assaulted nor threatened him directly. Moreover, the victim posed no imminent threat to Mize at the time of the homicide.

Mize's testimony that he did not aim the shotgun to kill McDonald avails him nothing. If this were true, the first requirement of self-defense, that defendant believed it necessary to kill the victim, would not be met. Furthermore, Mize's testimony shows he intended at least to inflict serious bodily harm upon the victim, which is enough to establish his murderous intent.

We therefore hold that the evidence did not support a jury instruction on self-defense, and that defendant received a fair trial free from prejudicial error.

No error.