STATE OF NORTH CAROLINA v. JUDY ANN LAWS NORMAN

No. 8729SC676

(Filed 5 April 1988)

**Homicide § 28.1— self-defense—sleeping victim—battered spouse syndrome**

　　Defendant was entitled to an instruction on perfect self-defense in a prosecution for the murder of her husband by shooting him while he was sleeping where there was evidence tending to show that defendant suffered from abused spouse syndrome; defendant had been subjected by decedent to beatings, other physical abuse, verbal abuse and threats on her life throughout the day of the killing up to the time when decedent went to sleep; defendant believed it necessary to kill the victim to save herself from death or serious bodily harm; and defendant felt helpless to extricate herself from abuse by defendant. Based on this evidence, the jury could find that decedent's sleep was but a momentary hiatus in a continuous reign of terror by the decedent, that defendant merely took advantage of her first opportunity to protect herself, and that defendant's act was not without the provocation required for perfect self-defense.

APPEAL by defendant from *Gardner (John), Judge.* Judgment entered 5 March 1987 in Superior Court, RUTHERFORD County. Heard in the Court of Appeals 10 December 1987.

Defendant, indicted for first degree murder in the shooting death of her husband, was found guilty of voluntary manslaughter by the jury and sentenced to six years' imprisonment. Defendant appeals from the judgment.

*Attorney General Lacy H. Thornburg, by Assistant Attorney General Jeffrey P. Gray, for the State.*

*Robert W. Wolf and Robert L. Harris for defendant-appellant.*

PARKER, Judge.

At trial the judge instructed on first degree murder, second degree murder, and voluntary manslaughter. The primary issue presented on this appeal is whether the trial court erred in failing to instruct on self-defense. We answer in the affirmative and grant a new trial.

## FACTS

At trial the State presented the testimony of a deputy sheriff of the Rutherford County Sheriff's Department who testified that on 12 June 1985, at approximately 7:30 p.m., he was dispatched to the Norman residence. There, in one of the bedrooms, he found decedent, John Thomas "J.T." Norman (herein decedent or Norman) dead, lying on his left side on a bed. The State presented an autopsy report, stipulated to by both parties, concluding that Norman had died from two gunshot wounds to the head. The deputy sheriff also testified that later that evening, after being advised of her rights, defendant told the officer that decedent, her husband, had been beating her all day, that she went to her mother's house nearby and got a .25 automatic pistol, that she returned to her house and loaded the gun, and that she shot her husband. The officer noted at the time that there were burns and bruises on defendant's body.

Defendant's evidence, presented through several different witnesses, disclosed a long history of verbal and physical abuse leveled by decedent against defendant. Defendant and Norman had been married twenty-five years at the time of Norman's death. Norman was an alcoholic. He had begun to drink and to beat defendant five years after they were married. The couple had five children, four of whom are still living. When defendant was pregnant with her youngest child, Norman beat her and kicked her down a flight of steps, causing the baby to be born prematurely the next day.

Norman, himself, had worked one day a few months prior to his death; but aside from that one day, witnesses could not remember his ever working. Over the years and up to the time of his death, Norman forced defendant to prostitute herself every day in order to support him. If she begged him not to make her go, he slapped her. Norman required defendant to make a mini-

mum of one hundred dollars per day; if she failed to make this minimum, he would beat her.

Norman commonly called defendant "Dogs," "Bitches," and "Whores," and referred to her as a dog. Norman beat defendant "most every day," especially when he was drunk and when other people were around, to "show off." He would beat defendant with whatever was handy — his fist, a fly swatter, a baseball bat, his shoe, or a bottle; he put out cigarettes on defendant's skin; he threw food and drink in her face and refused to let her eat for days at a time; and he threw glasses, ashtrays, and beer bottles at her and once smashed a glass in her face. Defendant exhibited to the jury scars on her face from these incidents. Norman would often make defendant bark like a dog, and if she refused, he would beat her. He often forced defendant to sleep on the concrete floor of their home and on several occasions forced her to eat dog or cat food out of the dog or cat bowl.

Norman often stated both to defendant and to others that he would kill defendant. He also threatened to cut her heart out.

Witnesses for the defense also testified to the events in the thirty-six hours prior to Norman's death. On or about the morning of 10 June 1985, Norman forced defendant to go to a truck stop or rest stop on Interstate 85 in order to prostitute to make some money. Defendant's daughter and defendant's daughter's boyfriend accompanied defendant. Some time later that day, Norman went to the truck stop, apparently drunk, and began hitting defendant in the face with his fist and slamming the car door into her. He also threw hot coffee on defendant. On the way home, Norman's car was stopped by police, and he was arrested for driving under the influence.

When Norman was released from jail the next morning, on 11 June 1985, he was extremely angry and beat defendant. Defendant's mother said defendant acted nervous and scared. Defendant testified that during the entire day, when she was near him, her husband slapped her, and when she was away from him, he threw glasses, ashtrays, and beer bottles at her. Norman asked defendant to make him a sandwich; when defendant brought it to him, he threw it on the floor and told her to make him another. Defendant made him a second sandwich and brought it to him; Norman again threw it on the floor, telling her to put something on

her hands because he did not want her to touch the bread. Defendant made a third sandwich using a paper towel to handle the bread. Norman took the third sandwich and smeared it in defendant's face.

On the evening of 11 June 1985, at about 8:00 or 8:30 p.m., a domestic quarrel was reported at the Norman residence. The officer responding to the call testified that defendant was bruised and crying and that she stated her husband had been beating her all day and she could not take it any longer. The officer advised defendant to take out a warrant on her husband, but defendant responded that if she did so, he would kill her. A short time later, the officer was again dispatched to the Norman residence. There he learned that defendant had taken an overdose of "nerve pills," and that Norman was interfering with emergency personnel who were trying to treat defendant. Norman was drunk and was making statements such as, " 'If you want to die, you deserve to die. I'll give you more pills,' " and " 'Let the bitch die . . . . She ain't nothing but a dog. She don't deserve to live.' " Norman also threatened to kill defendant, defendant's mother, and defendant's grandmother. The law enforcement officer reached for his flashlight or blackjack and chased Norman into the house. Defendant was taken to Rutherford Hospital.

The therapist on call at the hospital that night stated that defendant was angry and depressed and that she felt her situation was hopeless. On the advice of the therapist, defendant did not return home that night, but spent the night at her grandmother's house.

The next day, 12 June 1985, the day of Norman's death, Norman was angrier and more violent with defendant than usual. According to witnesses, Norman beat defendant all day long. Sometime during the day, Lemuel Splawn, Norman's best friend, called Norman and asked Norman to drive with him to Spartanburg, where Splawn worked, to pick up Splawn's paycheck. Norman arrived at Splawn's house some time later. Defendant was driving. During the ride to Spartanburg, Norman slapped defendant for following a truck too closely and poured a beer on her head. Norman kicked defendant in the side of the head while she was driving and told her he would " 'cut her breast off and shove it up her rear end.' "

Later that day, one of the Normans' daughters, Loretta, reported to defendant's mother that her father was beating her mother again. Defendant's mother called the sheriff's department, but no help arrived at that time. Witnesses stated that back at the Norman residence, Norman threatened to cut defendant's throat, threatened to kill her, and threatened to cut off her breast. Norman also smashed a doughnut on defendant's face and put out a cigarette on her chest.

In the late afternoon, Norman wanted to take a nap. He lay down on the larger of the two beds in the bedroom. Defendant started to lie down on the smaller bed, but Norman said, " 'No bitch . . . Dogs don't sleep on beds, they sleep in [sic] the floor.' " Soon after, one of the Normans' daughters, Phyllis, came into the room and asked if defendant could look after her baby. Norman assented. When the baby began to cry, defendant took the child to her mother's house, fearful that the baby would disturb Norman. At her mother's house, defendant found a gun. She took it back to her home and shot Norman.

Defendant testified that things at home were so bad she could no longer stand it. She explained that she could not leave Norman because he would kill her. She stated that she had left him before on several occasions and that each time he found her, took her home, and beat her. She said that she was afraid to take out a warrant on her husband because he had said that if she ever had him locked up, he would kill her when he got out. She stated she did not have him committed because he told her he would see the authorities coming for him and before they got to him he would cut defendant's throat. Defendant also testified that when he threatened to kill her, she believed he would kill her if he had the chance.

The defense presented the testimony of two expert witnesses in the field of forensic psychology, Dr. William Tyson and Dr. Robert Rollins. Based on an examination of defendant and an investigation of the matter, Dr. Tyson concluded that defendant "fits and exceeds the profile, of an abused or battered spouse." Dr. Tyson explained that in defendant's case the situation had progressed beyond mere " 'Wife battering or family violence' " and had become "torture, degradation and reduction to an animal level of existence, where all behavior was marked purely by sur-

vival . . . ." Dr. Tyson stated that defendant could not leave her husband because she had gotten to the point where she had no belief whatsoever in herself and believed in the total invulnerability of her husband. He stated, "Mrs. Norman didn't leave because she believed, fully believed that escape was totally impossible. . . . She fully believed that [Norman] was invulnerable to the law and to all social agencies that were available; that nobody could withstand his power. As a result, there was no such thing as escape." Dr. Tyson stated that the incidences of Norman forcing defendant to perform prostitution and to eat pet food from pet dishes were parts of the dehumanization process. Dr. Tyson analogized the process to practices in prisoner-of-war camps in the Second World War and the Korean War.

When asked if it appeared to defendant reasonably necessary to kill her husband, Dr. Tyson responded, "I think Judy Norman felt that she had no choice, both in the protection of herself and her family, but to engage, exhibit deadly force against Mr. Norman, and that in so doing, she was sacrificing herself, both for herself and for her family."

Dr. Rollins was defendant's attending physician at Dorothea Dix Hospital where she was sent for a psychiatric evaluation after her arrest. Based on an examination of defendant, laboratory studies, psychological tests, interviews, and background investigation, Dr. Rollins testified that defendant suffered from "abused spouse syndrome." Dr. Rollins defined the syndrome in the following way:

> The "abused spouse syndrome" refers to situations where one spouse has achieved almost complete control and submission of the other by both psychological and physical domination. It's, to start with, it's usually seen in the females who do not have a strong sense of their own adequacy who do not have a lot of personal or occupational resources; it's usually associated with physical abuse over a long period of time, and the particular characteristics that interest us are that the abused spouse comes to believe that the other person is in complete control; that they themselves are worthless and they cannot get away; that there's no rescue from the other person.

When asked, in his opinion, whether it appeared reasonably necessary that defendant take the life of J. T. Norman, Dr. Rollins responded, "In my opinion, that course of action did appear necessary to Mrs. Norman." However, Dr. Rollins stated that he found no evidence of any psychotic disorder and that defendant was capable of proceeding to trial.

## LEGAL ANALYSIS

In North Carolina a defendant is entitled to an instruction on perfect self-defense as justification for homicide where, viewed in the light most favorable to the defendant, there is evidence tending to show that at the time of the killing:

(1) it appeared to defendant and he believed it to be necessary to kill the deceased in order to save himself from death or great bodily harm; and

(2) defendant's belief was reasonable in that the circumstances as they appeared to him at the time were sufficient to create such a belief in the mind of a person of ordinary firmness; and

(3) defendant was not the aggressor in bringing on the affray, i.e., he did not aggressively and willingly enter into the fight without legal excuse or provocation; and

(4) defendant did not use excessive force, i.e., did not use more force than was necessary or reasonably appeared to him to be necessary under the circumstances to protect himself from death or great bodily harm.

*State v. Gappins*, 320 N.C. 64, 70-71, 357 S.E. 2d 654, 659 (1987).

Under this standard, the reasonableness of defendant's belief in the necessity to kill decedent and non-aggression on defendant's part are two essential elements of the defense. The State, relying on *State v. Mize*, 316 N.C. 48, 340 S.E. 2d 439 (1986); *State v. Wallace*, 309 N.C. 141, 305 S.E. 2d 548 (1983); and *State v. Bush*, 307 N.C. 152, 297 S.E. 2d 563 (1982), argues that defendant was not entitled to an instruction on self-defense. The State contends that since decedent was asleep at the time of the shooting, defendant's belief in the necessity to kill decedent was, as a matter of law, unreasonable. The State further contends that even as-

suming *arguendo* that the evidence satisfied the requirement that defendant's belief be reasonable, defendant, being the aggressor, cannot satisfy the third requirement of perfect self-defense or the requirement of imperfect self-defense that the act be committed without murderous intent.

We agree with the State that defendant was not entitled to an instruction on imperfect self-defense. Imperfect self-defense has been defined as follows:

> "[I]f defendant believed it was necessary to kill the deceased in order to save herself from death or great bodily harm, and if defendant's belief was reasonable in that the circumstances as they appeared to her at the time were sufficient to create such a belief in the mind of a person of ordinary firmness, but defendant, although without murderous intent, was the aggressor in bringing on the difficulty, or defendant used excessive force, the defendant under those circumstances has only the *imperfect right of self-defense*, having lost the benefit of perfect self-defense, and is guilty at least of voluntary manslaughter."

*State v. Wilson*, 304 N.C. 689, 695, 285 S.E. 2d 804, 808 (1982) (quoting *State v. Norris*, 303 N.C. 526, 530, 279 S.E. 2d 570, 573 (1981)) (emphasis in original). As noted in *State v. Mize*, "Murderous intent means the intent to kill or inflict serious bodily harm." *Mize*, 316 N.C. at 52, 340 S.E. 2d at 442. As in *Mize*, if defendant did not intend to kill decedent, then the first requirement of self-defense, that defendant believed it necessary to kill the victim, would not be met. *Id.* at 54, 340 S.E. 2d at 443.

The question then arising on the facts in this case is whether the victim's passiveness at the moment the unlawful act occurred precludes defendant from asserting perfect self-defense.

Applying the criteria of perfect self-defense to the facts of this case, we hold that the evidence was sufficient to submit an issue of perfect self-defense to the jury. An examination of the elements of perfect self-defense reveals that both subjective and objective standards are to be applied in making the crucial determinations. The first requirement that it appear to defendant and that defendant believe it necessary to kill the deceased in order to save herself from death or great bodily harm calls for a subjec-

tive evaluation. This evaluation inquires as to what the defendant herself perceived at the time of the shooting. The trial was replete with testimony of forced prostitution, beatings, and threats on defendant's life. The defendant testified that she believed the decedent would kill her, and the evidence showed that on the occasions when she had made an effort to get away from Norman, he had come after her and beat her. Indeed, within twenty-four hours prior to the shooting, defendant had attempted to escape by taking her own life and throughout the day on 12 June 1985 had been subjected to beatings and other physical abuse, verbal abuse, and threats on her life up to the time when decedent went to sleep. Both experts testified that in their opinion, defendant believed killing the victim was necessary to avoid being killed. This evidence would permit a finding by a jury that defendant believed it necessary to kill the victim to save herself from death or serious bodily harm.

Unlike the first requirement, the second element of self-defense — that defendant's belief be reasonable in that the circumstances as they appeared to defendant would be sufficient to create such a belief in the mind of a person of ordinary firmness — is measured by the objective standard of the person of ordinary firmness under the same circumstances. Again, the record is replete with sufficient evidence to permit but not compel a juror, representing the person of ordinary firmness, to infer that defendant's belief was reasonable under the circumstances in which she found herself. Both expert witnesses testified that defendant exhibited severe symptoms of battered spouse syndrome, a condition that develops from repeated cycles of violence by the victim against the defendant. Through this repeated, sometimes constant, abuse, the battered spouse acquires what the psychologists denote as a state of "learned helplessness," defendant's state of mind as described by Drs. Tyson and Rollins. See Eber, The Battered Wife's Dilemma: To Kill or To Be Killed, 32 Hastings L.J. 895 (1981); Rosen, The Excuse of Self-Defense: Correcting a Historical Accident on Behalf of Battered Women Who Kill, 36 Am. U.L. Rev. 11 (1986). In the instant case, decedent's excessive anger, his constant beating and battering of defendant on 12 June 1985, her fear that the beatings would resume, as well as previous efforts by defendant to extricate herself from this abuse are circumstances to be considered in judging the reasonableness of defendant's belief that she would be seriously injured or killed at

the time the criminal act was committed. The evidence discloses that defendant felt helpless to extricate herself from this intolerable, dehumanizing, brutal existence. Just the night before the shooting, defendant had told the sheriff's deputy that she was afraid to swear out a warrant against her husband because he had threatened to kill her when he was released if she did. The inability of a defendant to withdraw from the hostile situation and the vulnerability of a defendant to the victim are factors considered by our Supreme Court in determining the reasonableness of a defendant's belief in the necessity to kill the victim. *See, e.g.,* cases compiled by Justice Exum in *State v. Mize,* 316 N.C. at 53, 340 S.E. 2d at 442.

To satisfy the third requirement, defendant must not have aggressively and willingly entered into the fight without legal excuse or provocation. By definition, aggression in the context of self-defense is tied to provocation. The existence of battered spouse syndrome, in our view, distinguishes this case from the usual situation involving a single confrontation or affray. The provocation necessary to determine whether defendant was the aggressor must be considered in light of the totality of the circumstances. Psychologists and sociologists report that battered spouse syndrome usually has three phases—the tension-building phase, the violent phase, and the quiet or loving phase. *See* L. Walker, *The Battered Woman Syndrome,* at 95-104 (1984). During the violent phase, the time when the traditional concept of self-defense would mandate that defendant protect herself, *i.e.,* at the moment the abusing spouse attacks, the battered spouse is least able to counter because she is immobilized by fear, if not actually physically restrained. *See State v. Kelly,* 97 N.J. 178, 220, 478 A. 2d 364, 385 n. 23 (1984).

Mindful that the law should never casually permit an otherwise unlawful killing of another human being to be justified or excused, this Court is of the opinion that with the battered spouse there can be, under certain circumstances, an unlawful killing of a passive victim that does not preclude the defense of perfect self-defense. Given the characteristics of battered spouse syndrome, we do not believe that a battered person must wait until a deadly attack occurs or that the victim must in all cases be actually attacking or threatening to attack at the very moment defendant commits the unlawful act for the battered person to act in self-defense. Such a standard, in our view, would ignore the realities of the condition. This position is in accord with other jurisdictions

that have addressed the issue. *See, e.g., State v. Gallegos*, 104 N.M. 247, 719 P. 2d 1268 (N.M. Ct. App. 1986); *State v. Leidholm*, 334 N.W. 2d 811 (N.D. 1983); *State v. Allery*, 101 Wash. 2d 591, 682 P. 2d 312 (1984).

In the instant case, decedent, angrier than usual, had beaten defendant almost continuously during the afternoon and had threatened to maim and kill defendant. Hence, although decedent was asleep at the time defendant shot him, defendant's unlawful act was closely related in time to an assault and threat of death by decedent against defendant. Defendant testified that she took the baby to her mother's house because she was afraid that the child's crying would wake decedent and the beatings would resume. Based on this evidence, a jury, in our view, could find that decedent's sleep was but a momentary hiatus in a continuous reign of terror by the decedent, that defendant merely took advantage of her first opportunity to protect herself, and that defendant's act was not without the provocation required for perfect self-defense.

Finally, the expert testimony considered with the other evidence would permit reasonable minds to infer that defendant did not use more force than reasonably appeared necessary to her under the circumstances to protect herself from death or great bodily harm.

Based on the foregoing analysis, we are of the opinion that, in addition to the instruction on voluntary manslaughter, defendant was entitled to an instruction on perfect self-defense. Weighing the evidence against the four criteria for self-defense, the jury is to regard evidence of battered spouse syndrome merely as some evidence to be considered along with all other evidence in making its determination whether there is a reasonable doubt as to the unlawfulness of defendant's conduct. *See State v. Hankerson*, 288 N.C. 632, 220 S.E. 2d 575 (1975), *rev'd on other grounds*, 432 U.S. 233, 97 S.Ct. 2339, 53 L.Ed. 2d 306 (1977).

Defendant's remaining assignment of error that the trial court erred in denying defendant's motion to dismiss based on uncontradicted exculpatory statements introduced by the State is without merit and is overruled.

New trial.

Judges WELLS and PHILLIPS concur.