IN THE SUPREME COURT OF NORTH CAROLINA

No. 208PA16

Filed 9 June 2017

STATE OF NORTH CAROLINA

v.

JOSHUA EARL HOLLOMAN

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, ___ N.C. App. ___, 786 S.E.2d 328 (2016), finding prejudicial error in a judgment entered on 27 April 2015 by Judge Donald W. Stephens in Superior Court, Wake County, and awarding defendant a new trial. Heard in the Supreme Court on 11 April 2017.

> *Joshua H. Stein, Attorney General, by Joseph L. Hyde, Assistant Attorney General, for the State-appellant.*
>
> *Glenn Gerding, Appellate Defender, by Amanda S. Zimmer, Assistant Appellate Defender, for defendant-appellee.*

ERVIN, Justice.

The issue before this Court is whether the Court of Appeals erred by determining that the trial court committed prejudicial error in the course of instructing the jury concerning the right of self-defense. After carefully considering the record in light of the applicable law, we hold that the trial court's self-defense instructions were not erroneous, reverse the decision of the Court of Appeals to the

contrary, and remand this case to the Court of Appeals for consideration of defendant's remaining challenge to the trial court's judgment.

During the early morning hours of 1 January 2014, defendant Joshua Earl Holloman shot Darryl Anthony Bobbitt a number of times using a .45 caliber handgun at the corner of Rock Quarry Road and Martin Luther King Boulevard in Raleigh. According to Mr. Bobbitt, he and Mariah Mann, whom he believed to be his girlfriend, went to a bar to celebrate the imminent arrival of the New Year on the evening of 31 December 2013. Shortly after midnight, Mr. Bobbitt decided to wait in his vehicle until the time that the bar closed and Ms. Mann was ready to leave given that relations between the two of them had become strained during the course of the evening. After Ms. Mann left the bar, the two of them returned to Mr. Bobbitt's home, where they began to argue. Eventually, Ms. Mann left Mr. Bobbitt's home on foot. After his mother and stepfather failed to induce Ms. Mann to return to the family home, Mr. Bobbitt began searching for Ms. Mann and eventually located her near some woods along Martin Luther King Boulevard in Raleigh.

Upon locating Ms. Mann, Mr. Bobbitt exited his car and crossed the road for the purpose of attempting to persuade Ms. Mann to enter his vehicle. In view of the fact that Ms. Mann appeared to be adhering to his request, Mr. Bobbitt reversed course and began walking back to his vehicle. As he did so, Mr. Bobbitt heard someone say, "Oh, you put your hands on her." According to Mr. Bobbitt:

> Once I heard that, I turned around. I looked back, saw the gun, so of course I had my gun. I turned back around, reached for my gun, and once I turned back around, I was already shot.
>
> . . . .
>
> I got shot, stumbled. Next thing I know, I'm looking at the pavement, and I just see somebody standing over me.

Mr. Bobbitt denied having fired any shots from his own weapon. Mr. Bobbitt sustained four gunshot wounds, two of which entered his stomach, one of which entered his left leg, and one of which pierced his right arm.

After confirming Mr. Bobbitt's account of the events leading up to the confrontation, Ms. Mann testified that, while Mr. Bobbitt was trying to get her to enter his car, she was attempting to call defendant, with whom she had also been romantically involved and with whom she had been in contact earlier in the evening for the purpose of requesting that he come get her. As she attempted to contact defendant, Mr. Bobbitt took her phone out of her hand. Upon arriving at the location at which Ms. Mann and Mr. Bobbitt were standing, defendant parked his car, got out of his vehicle, and told Ms. Mann to get inside. After complying with defendant's request, Ms. Mann lowered her head and began crying. As she wept, Ms. Mann heard defendant ask Mr. Bobbitt if "he [had] put his hands on [Ms. Mann]" before hearing the firing of several gunshots. After the firing of these gunshots, defendant returned to the car, told Ms. Mann that he thought that he had shot Mr. Bobbitt, and drove away.

Anna Dajui was driving her daughter, Roxana, home from a New Year's Eve party when a vehicle sped in front of them and stopped in the middle of the street. At that point, the Dajuis saw the driver of the vehicle get out of the car, reach for a firearm, and begin shooting at a second individual who was standing at the intersection of Rock Quarry Road and Martin Luther King Boulevard. After the man fired several shots, the Dajuis saw the second man lying in the roadway.

Fortuitously, Sergeant Jennings Bunch of the Raleigh Police Department was patrolling in the area and happened to be at the intersection of Rock Quarry Road and Martin Luther King Boulevard at the time that the shooting occurred. Like the Dajuis, Sergeant Bunch saw the driver emerging from a vehicle that had stopped at the intersection. After hearing angry voices and a series of gunshots, Sergeant Bunch saw the driver of the stopped vehicle standing over and pointing a handgun at a second man, who was lying on the ground. Upon making these observations, Sergeant Bunch fired several shots into the air, an action that caused the driver of the vehicle to leave the scene.

On the other hand, defendant testified that in the early morning hours of 1 January 2014, he received a voice mail and a phone call from Ms. Mann, who appeared to be in a distressed condition, asking defendant to pick her up on Martin Luther King Boulevard. After arriving at the indicated location, defendant observed Ms. Mann walking on the sidewalk while being followed by another individual. Upon reaching Ms. Mann's location, defendant stopped his vehicle beside her, exited his

vehicle while holding his gun by his side, and told Ms. Mann to get into his vehicle. When he noticed that Ms. Mann was crying and that there was blood on her face, defendant asked the man walking behind her whether "he [had] put his hands on her," stepped closer to the man after failing to hear any response, and repeated his question. By the time that he stepped toward the man, that individual turned around towards him and "open[ed] fire" upon defendant. In light of the fact that he feared for his life, defendant fired his weapon "[m]aybe three to five times" in an attempt to defend himself. After the man fell to the ground, defendant stood over him for a brief period of time. Upon hearing gunfire, defendant left the scene and went to the residence of his mother, where he was apprehended later that morning.

On 1 January 2014, an arrest warrant charging defendant with assault with a deadly weapon with the intent to kill and inflicting serious injury was issued. On 24 February 2014, the Wake County grand jury returned a bill of indictment charging defendant with assault with a deadly weapon with the intent to kill and inflicting serious injury. The charge against defendant came on for trial before the trial court and a jury at the 20 April 2015 criminal session of the Superior Court, Wake County.

At the jury instruction conference, defendant's trial counsel requested the trial court to instruct the jury concerning the law of self-defense and defense of another,

among other subjects.[1]  More specifically, defendant requested the trial court to instruct the jury that:

> The defendant would be excused of assault with a deadly weapon with intent to kill inflicting serious injury on the ground of self-defense if:
>
> First, it appeared to the defendant and the defendant believed it to be necessary to assault the victim in order to save the defendant from death or great bodily harm.
>
> And Second, the circumstances as they appeared to the defendant at the time were sufficient to create such a belief in the mind of a person of ordinary firmness.  It is for you the jury to determine the reasonableness of the defendant's belief from the circumstances as they appeared to the defendant at the time.
>
> And Third, [i]f the defendant was not the aggressor and the defendant was at a place the defendant had a lawful right to be, the defendant could stand the defendant's ground and repel force with force regardless of the character of the assault being made upon the defendant except deadly force unless he reasonably believed that such force was necessary to prevent imminent death or great bodily harm to himself or another.
>
> However, the defendant would not be excused if the defendant used excessive force.
>
> . . . .
>
> The defendant would not be guilty of any assault if the defendant acted in self-defense, and if the defendant was not the aggressor in provoking the fight and did not use excessive force under the circumstances.

---

[1] The trial court declined to instruct the jury concerning the right of one person to defend another on the grounds that "[t]here's no evidence to suggest that this defendant acted to defend anyone other than himself."  Defendant has not challenged the trial court's refusal to deliver a defense of another instruction before either the Court of Appeals or this Court.

One enters a fight voluntarily if one uses toward one's opponent abusive language, which, considering all of the circumstances, is calculated and intended to provoke a fight. If the defendant voluntarily and without provocation entered the fight, the defendant would be considered the aggressor unless the defendant thereafter attempted to abandon the fight and gave notice to the deceased that the defendant was doing so. . . . A person is also justified in using defensive force when the force used by the person who was provoked is so serious that the person using defensive force reasonably believes that he was in imminent danger of death or serious bodily harm, the person using defensive force had no reasonable means to retreat, and the use of force likely to cause death or serious bodily harm was the only way to escape the danger. The defendant is not entitled to the benefit of self-defense if the defendant was the aggressor with the intent to kill or inflict serious bodily harm upon the deceased.

Instead of delivering the exact instruction that defendant requested, however, the trial court instructed the jury with respect to the issue of self-defense using a modified version of the pattern jury instruction relating to felonious assaults in which the defendant claimed to have acted in self-defense, stating that:

If the State has satisfied you beyond a reasonable doubt that the defendant assaulted Darryl Bobbitt with a deadly weapon with intent to cause death or serious bodily injury, then you would consider whether the defendant's actions are excused and the defendant is not guilty because the defendant acted in lawful self-defense. . . .

If the circumstances which the defendant encountered at the time would have created a reasonable belief in the mind of a person of ordinary firmness that an assault upon Darryl Bobbitt with a firearm was necessary or appeared to be necessary to protect the defendant from imminent death or great bodily harm, and the

circumstances did create such a belief in the defendant's mind at the time the defendant acted, such assault with a firearm upon Darryl Bobbitt would be justified by self-defense. . . .

A person is justified in using defensive force to defend himself when the force used against him is so serious that the person using defensive force reasonably believes that he is in imminent danger of death or serious bodily harm, the person using defensive force has no reasonable means to avoid the use of that force, and his use of force likely to cause death or serious bodily harm is the only way to escape the danger. . . .

Furthermore, self-defense is justified only if the defendant was not himself the aggressor. Justification for lawful self-defense is not present if the person who uses defensive force voluntarily enters into a fight with the intent to use deadly force. In other words, if one initially displays a firearm to his opponent, intending to engage in a fight and intending to use deadly force in that fight and provokes the use of deadly force against himself by an alleged victim, he is himself an aggressor and cannot claim he acted lawfully to defend himself.

On 24 April 2015, the jury returned a verdict finding defendant guilty of the lesser included offense of assault with a deadly weapon inflicting serious injury. Based upon the jury's verdict, the trial court entered a judgment sentencing defendant to a term of twenty-five to forty-two months imprisonment. However, the trial court suspended defendant's active sentence and placed him on supervised probation for a period of thirty-six months on the condition that he comply with the usual terms and conditions of probation, serve a term of ten months imprisonment in the custody of the Division of Adult Corrections, make restitution in the amount of

$2,989.00, pay the costs, including the cost of his court-appointed attorney, and refrain from having any contact with Mr. Bobbitt or any member of his family. Defendant noted an appeal to the Court of Appeals from the trial court's judgment.

In seeking relief from the trial court's judgment before the Court of Appeals, defendant argued that the trial court's self-defense instruction misstated the applicable law and deprived him of the ability to fully present his defense.[2] More specifically, defendant asserted that, in light of the enactment of N.C.G.S. § 14-51.4(2)(a), the trial court erred by instructing the jury that "[j]ustification for lawful self-defense is not present if the person who uses defensive force voluntarily enter[ed] into a fight with the intent to use deadly force" and that, "if one initially displays a firearm to his opponent, intending to engage in a fight and intending to use deadly force in that fight and provokes the use of deadly force against himself by an alleged victim, he is himself an aggressor and cannot claim he acted lawfully to defend himself" and failing to instruct the jury that it could find that defendant regained the right to use defensive force pursuant to N.C.G.S. § 14-51.4(2)(a). In defendant's view, the enactment of N.C.G.S. § 14-51.4(2)(a), which allows a "person who initially provokes the use of force against himself or herself" to utilize defensive force in the event that "[t]he force used by the person who was provoked is so serious that the

---

[2] In addition, defendant argued that the trial judge had unlawfully considered his personal feelings concerning firearm possession and other subjects in passing judgment upon defendant. However, we need not discuss this issue in any detail in this opinion given that the Court of Appeals declined to reach it given its decision to award defendant a new trial based upon the instructional error that it found the trial court to have committed.

person using defensive force reasonably believes that he or she was in imminent danger of death or serious bodily harm, the person using defensive force had no reasonable means to retreat, and the use of force which is likely to cause death or serious bodily harm to the person who was provoked [is] the only way to escape the danger," "arguably changes the common law as it relates [to] aggressors and the right to self-defense." According to defendant, his own "actions in possessing a gun and questioning [Mr.] Bobbitt over an incident that may have just occurred could have been seen by the jury as [defendant] initiating or seeking to provoke a fight with [Mr.] Bobbitt," causing Mr. Bobbitt to respond by "pulling a concealed gun from his pocket and firing at [defendant]." The amount of "force used by [Mr.] Bobbitt against [defendant] was so serious as to lead [defendant] to reasonably believe that he was in imminent danger of death or serious bodily harm, that he had no reasonable means to retreat, and that the use of force likely to cause death or serious bodily harm to [Mr.] Bobbitt was the only way to escape the danger." However, the self-defense instruction that the trial court actually delivered to the jury "failed to allow for the jury to consider whether [defendant] regained his right to self-defense under [N.C.G.S.] § 14-51.4 even if he had initiated or provoked the fight with [Mr.] Bobbitt," an error that prejudiced defendant and entitled him to a new trial given that "there is a reasonable probability that the jury would [have] acquitted [defendant] had they been properly instructed on the right to use self-defense even if [defendant] was the aggressor."

The State, on the other hand, argued that defendant had "requested an instruction substantially identical to the one" that the trial court had delivered, so that defendant had invited the commission of the error upon which his challenge to the trial court's judgment was predicated, citing *State v. Wilkinson*, 344 N.C. 198, 236, 474 S.E.2d 375, 396 (1996). In addition, the State argued that defendant had failed to demonstrate that the enactment of N.C.G.S. § 14-51.4 had "changed the law with regard to an aggressor *who had the intent to kill*." On the contrary, the statutory reference to a person who " 'initially provokes the use of force' must mean an aggressor *without murderous intent*" in order to avoid "allow[ing] a pretextual quarrel to countenance premeditated murder." In the State's view, the trial court's instructions "adequately informed the jury that a person may use defensive force when he reasonably believes [that] he is in imminent danger, he has no reasonable means to avoid the use of force, and his use of force is the only way to escape the danger."

The Court of Appeals awarded defendant a new trial on the grounds that "[t]he trial court's deviations from the pattern self-defense instruction, taken as a whole, misstated the law by suggesting that an aggressor cannot under any circumstances regain justification for using defensive force." *State v. Holloman*, ___ N.C. App. ___, ___, 786 S.E.2d 328, 334 (2016). According to the Court of Appeals, N.C.G.S. § 14-51.4(2)(a) allows "the person who initially provokes the use of force . . . to "us[e] defensive force" in the event that "[t]he force used by the person who was provoked is

so serious that the person using defensive force reasonably believes that he or she was in imminent danger of death or serious bodily harm, the person using defensive force had no reasonable means to retreat, and the use of force which is likely to cause death or serious bodily harm to the person who was provoked was the only way to escape the danger." *Id.* at ___, 786 S.E.2d at 332 (quoting N.C.G.S. § 14-51.4(2)(a) (2015)). The trial court erred, in the Court of Appeals' view, by "eliminat[ing] references to circumstances in which an aggressor can lawfully defend himself" and suggesting "that[,] if jurors determined [d]efendant had initiated the gun fight, they could not find that [he] acted in lawful self-defense, even if Mr. Bobbitt fired his gun first." *Id.* at ___, 786 S.E.2d at 334. As a result, after finding the trial court's error to be prejudicial, the Court of Appeals awarded defendant a new trial. This Court granted the State's request for discretionary review of the Court of Appeals' decision.

In seeking to persuade us to reverse the Court of Appeals' decision, the State notes that "[t]he 'law of self-defense in cases of homicide applies also in cases of assault,'" quoting *State v. Anderson*, 230 N.C. 54, 55, 51 S.E.2d 895, 897 (1949). As a result, "one who brings about an affray with the intent to take life or inflict serious bodily harm may not claim self-defense," citing *State v. Mize*, 316 N.C. 48, 52, 340 S.E.2d 439, 442 (1986). For that reason, the State argues that, "[i]f the defendant was the aggressor and killed with murderous intent, that is, the intent to kill or inflict serious bodily harm, then she is not entitled to an instruction on self-defense," quoting the dissenting opinion in *State v. Norman*, 324 N.C. 253, 274, 378 S.E.2d 8,

20 (1989). Although the State acknowledges that N.C.G.S. § 14-51.4(2)(a) appears to "abrogate[ ] the principle . . . that one who wrongfully commenced a fight may not regain the right of self-defense upon being sorely pressed by his adversary," this apparent statutory expansion of the right of self-defense should not, as a matter of "common law, statutory context, and common sense," apply to "aggressors with murderous intent." According to the State, "[t]he legislature simply could not have intended for one who attacks with murderous intent to claim self-defense" given that "allow[ing] one to use defensive force when his intended victim lawfully responds with deadly force would legitimize both parties' conduct." For that reason, the challenged trial court instruction to the effect that an aggressor using deadly force could not regain the right to use defensive force did not misstate the applicable law and was not, for that reason, erroneous.

Defendant, on the other hand, asserts that the Court of Appeals correctly granted him a new trial based upon the trial court's failure to allow the jury to consider whether he had regained the right to use defensive force even if he was the aggressor. Assuming that "the statute only applies to aggressors without murderous intent," the challenged instruction "was still erroneous" because "[t]he intent to use deadly force is not the same as murderous intent" and "because the jury was not instructed to consider if [defendant] was an aggressor with murderous intent." According to defendant, the trial court's instructions allowed the jury to "conclude[ ] that [defendant] was an aggressor with intent to use 'deadly force' merely because he

possessed a firearm and intended to use it to defend Ms. Mann and himself, if necessary." However, the jury failed to find that defendant intended to kill Mr. Bobbitt when it convicted him of assault with a deadly weapon inflicting serious injury rather than assault with a deadly weapon with the intent to kill and inflicting serious injury. In light of the conflicts in the evidence, "the jury had to determine if [Mr.] Bobbitt had the right to use lethal force against [defendant] and whether [defendant] had the right to use defensive force in response." Since the trial court's instructions "did not tell the jury that [defendant] could use defensive force even if the jury felt [that defendant] had provoked [Mr.] Bobbitt," those instructions "misstated the law, confused the jury, and deprived [defendant] of his constitutional right to fully present his defense." As a result, given that "[t]here is a reasonable possibility that the trial court's error impacted the jury's decision," the Court of Appeals correctly awarded defendant a new trial.

The ultimate issue before us in this case is the extent, if any, to which the trial court erred by instructing the jury that an individual having the status of an aggressor using deadly force could not regain the right to act in self-defense and by failing to instruct the jury that the aggressor may be entitled to utilize defensive force in the event that the person provoked responded by using such significant force that the aggressor was placed in imminent danger of death or serious bodily harm, the aggressor did not have a reasonable opportunity to retreat, and the aggressor can only protect himself or herself from death or serious bodily harm by using defensive

force.  According to well-established North Carolina law, a trial judge's jury charge shall "give a clear instruction which applies the law to the evidence in such manner as to assist the jury in understanding the case and in reaching a correct verdict." *State v. Smith*, 360 N.C. 341, 346, 626 S.E.2d 258, 261 (2006) (quoting *State v. Williams*, 280 N.C. 132, 136, 184 S.E.2d 875, 877 (1971)).  For that reason, "the judge has the duty to instruct the jury on the law arising from all the evidence presented." *Id.* at 346, 626 S.E.2d at 261 (quoting *State v. Moore*, 75 N.C. App. 543, 546, 331 S.E.2d 251, 253, *disc. rev. denied*, 315 N.C. 188, 337 S.E.2d 862 (1985)).  In instructing the jury with respect to a defense to a criminal charge, "the facts must be interpreted in the light most favorable to the defendant." *State v. Montague*, 298 N.C. 752, 755, 259 S.E.2d 899, 902 (1979).

> A defendant may request a jury instruction in writing, and the trial court must so instruct provided the instruction is supported by the evidence.  However, a trial court is not obligated to give a defendant's exact instruction so long as the instruction actually given delivers the substance of the request to the jury.

*State v. Roache*, 358 N.C. 243, 304, 595 S.E.2d 381, 420 (2004) (citing *State v. McNeill*, 346 N.C. 233, 239, 485 S.E.2d 284, 288 (1997), *cert. denied*, 522 U.S. 1053, 118 S. Ct. 704, 139 L. Ed. 2d 647 (1998); *State v. Atkins*, 349 N.C. 62, 90, 505 S.E.2d 97, 115 (1998), *cert. denied*, 526 U.S. 1147, 119 S. Ct. 2025, 143 L. Ed. 2d 1036 (1999)).  Although "[u]se of the pattern instructions is encouraged," *State v. Garcell*, 363 N.C. 10, 49, 678 S.E.2d 618, 642-43 (citation omitted), *cert. denied*, 558 U.S. 999, 130 S.

Ct. 510, 175 L. Ed. 2d 362 (2009), "[f]ailure to follow the pattern instructions does not automatically result in error," *State v. Bunch,* 363 N.C. 841, 846, 689 S.E.2d 866, 870 (2010); *see also State v. Mundy,* 265 N.C. 528, 529, 144 S.E.2d 572, 573 (1967) (stating that, "[i]n giving instructions the court is not required to follow any particular form and has wide discretion as to the manner in which the case is presented to the jury, but it has the duty to explain, without special request therefor, each essential element of the offense and to apply the law with respect to each element to the evidence bearing thereon"). On the other hand, even though "no exact formula is required" when the trial court instructs the jury, "[o]nce it undertakes to do so, however, the [instructions] should be given in substantial accord with those approved by this [C]ourt." *State v. Watson,* 294 N.C. 159, 167, 240 S.E.2d 440, 446 (1978) (citing *State v. Hammonds,* 241 N.C. 226, 85 S.E.2d 133 (1954)); *see also State v. Davis,* 238 N.C. 252, 253-54, 77 S.E.2d 630, 631 (1953) (stating that "[c]orrect instruction as to the law . . . limit[s] [the trial judge's] responsibilit[ies]"). Thus, we must determine whether the trial court's self-defense instructions accurately stated the applicable law arising upon the evidentiary record developed at trial.

The initial issue that must be addressed in order to determine whether the trial court correctly instructed the jury with respect to the self-defense issue is the extent, if any, to which North Carolina law allows an aggressor to regain the right to utilize defensive force based upon the nature and extent of the reaction that he or she provokes in the other party. Historically, as the State notes, North Carolina law did

not allow an aggressor using deadly force to regain the right to exercise the right of self-defense in the event that the person to whom his or her aggression was directed responded by using deadly force to defend himself or herself. *State v. Wetmore*, 298 N.C. 743, 750, 259 S.E.2d 870, 875 (1979) (stating that, "[i]f one takes life, though in defense of his own life, in a quarrel which he himself has commenced with intent to take life or inflict serious bodily harm, the jeopardy into which he has been placed by the act of his adversary constitutes no defense whatever, but he is guilty of murder" (quoting *State v. Potter*, 295 N.C. 126, 144 n.2, 244 S.E.2d 397, 409 n.2 (1978))).[3] According to N.C.G.S. § 14-51.3, however:

> (a) A person is justified in using force, except deadly force, against another when and to the extent that the person reasonably believes that the conduct is necessary to defend himself or herself or another against the other's imminent use of unlawful force. However, a person is justified in the use of deadly force and does not have a duty to retreat in any place he or she has the lawful right to be if either of the following applies:
>
> > (1) He or she reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or herself or another.

---

[3] Although defendant appears to understand the references to "murderous intent" and "deadly force" as contained in certain of our prior decisions to refer to a specific intent to kill and argues that only such a specific intent to kill obviates an aggressor's right to use defensive force, that understanding is simply incorrect. Instead, "[m]urderous intent means the intent to kill or inflict serious bodily harm," *Mize*, 316 N.C. at 52, 340 S.E.2d at 442, and "[d]eadly force has been defined as 'force likely to cause death or great bodily harm,' " *State v. Hunter*, 315 N.C. 371, 373, 338 S.E.2d 99, 102 (1986) (quoting *State v. Clay*, 297 N.C. 555, 563, 256 S.E.2d 176, 182 (1979), *overruled on other grounds*, *State v. Davis*, 305 N.C. 400, 290 S.E.2d 574 (1982)).

> (2) Under the circumstances permitted pursuant to [N.C.] G.S. [§] 14-51.2.[4]

N.C.G.S. § 14-51.3 (2015). However, as has already been noted, N.C.G.S. § 14-51.4 provides, in pertinent part, that:

> The justification described in [N.C.]G.S. [§] 14-51.2 and [N.C.]G.S. [§] 14-51.3 is not available to a person who used defensive force and who:
>
> . . . .
>
> (2) Initially provokes the use of force against himself or herself. However, the person who initially provokes the use of force against himself or herself will be justified in using defensive force if either of the following occur:
>
>> a. The force used by the person who was provoked is so serious that the person using defensive force reasonably believes that he or she was in imminent danger of death or serious bodily harm, the person using defensive force had no reasonable means to retreat, and the use of force which is likely to cause death or serious bodily harm to the person who was provoked was the only way to escape the danger.

*Id*. As this language reflects and as the State acknowledges, the General Assembly, by enacting this legislation, appears to have allowed an aggressor to regain the right to utilize defensive force under certain circumstances. Moreover, as the State also concedes, N.C.G.S. § 14-51.4(2)(a) does not, when read literally, appear to distinguish between situations in which the aggressor did or did not utilize deadly force. The absence of such a limitation does not, as defendant appears to suggest, necessarily

---

[4] N.C.G.S. § 14-51.2 addresses a person's right to use defensive force for the purpose of protecting one's home, workplace, or motor vehicle.

resolve this issue. Instead, we can only determine whether the right to utilize defensive force can be regained by an aggressor using deadly force by properly construing the relevant statutory provision.

"The principal goal of statutory construction is to accomplish the legislative intent." *Lenox, Inc. v. Tolson*, 353 N.C. 659, 664, 548 S.E.2d 513, 517 (2001) (citing *Polaroid Corp. v. Offerman*, 349 N.C. 290, 297, 507 S.E.2d 284, 290 (1998), *cert. denied*, 526 U.S. 1098, 119 S. Ct. 1576, 143 L.Ed. 2d 671 (1991), *abrogated in part on other grounds by Lenox*, 353 N.C. at 663-64, 548 S.E.2d at 517). For that reason, "[l]egislative intent controls the meaning of a statute." *Brown v. Flowe*, 349 N.C. 520, 522, 507 S.E.2d 894, 895 (1998) (quoting *Shelton v. Morehead Mem'l Hosp.*, 318 N.C. 76, 81, 347 S.E.2d 824, 828 (1986)). "The best indicia of that intent are the language of the statute . . . , the spirit of the act and what the act seeks to accomplish." *Coastal Ready-Mix Concrete Co. v. Bd. of Comm'rs of the Town of Nags Head*, 299 N.C. 620, 629, 265 S.E.2d 379, 385 (1980) (citations omitted).

> If the language of a statute is free from ambiguity and expresses a single, definite, and sensible meaning, judicial interpretation is unnecessary and the plain meaning of the statute controls. Conversely, "where a literal interpretation of the language of a statute will lead to absurd results, or contravene the manifest purpose of the Legislature, as otherwise expressed, the reason and purpose of the law shall control and the strict letter thereof shall be disregarded." *State v. Barksdale*, 181 N.C. 621, [625,] 107 S.E. 505[, 507] (1921).

*Mazda Motors of Am., Inc. v. Sw. Motors, Inc.*, 296 N.C. 357, 361, 250 S.E.2d 250, 253 (1979) (internal citations omitted).

The effect of adopting the construction of N.C.G.S. § 14-51.4(2)(a) espoused by defendant, which would allow an aggressor to utilize defensive force in the event that his conduct caused the person provoked to lawfully utilize deadly force in his own defense, cannot be squared with the likely legislative intent motivating the enactment of the relevant statutory provision. Simply put, the adoption of defendant's construction of N.C.G.S. § 14-51.4(2)(a) would create a situation in which the aggressor utilized deadly force in attacking the other party, the other party exercised his or her right to utilize deadly force in his or her own defense, and the initial aggressor then utilized deadly force in defense of himself or herself, thereby starting the self-defense merry-go-round all over again. We are unable to believe that the General Assembly intended to foster such a result, under which gun battles would effectively become legal, and hold that the provisions of N.C.G.S § 14-51.4(2)(a) allowing an aggressor to regain the right to use defensive force under certain circumstances do not apply in situations in which the aggressor initially uses deadly force against the person provoked. *See Mize*, 316 N.C. at 52, 340 S.E.2d at 442 (stating that, "[i]f . . . one brings about an affray with the intent to take life or inflict serious bodily harm, he is not entitled even to the doctrine of imperfect self-defense" (quoting *Wetmore*, 298 N.C. at 750, 259 S.E.2d at 875)). As a result, the trial court's instruction to the effect that a defendant who was the aggressor using deadly force

had forfeited the right to use deadly force in self-defense and that a person who displays a firearm to his opponent with the intent to use deadly force against him or her and provokes the use of deadly force in response is an aggressor for purposes of the law of self-defense does not constitute an inaccurate statement of the applicable North Carolina law.

Our determination that the instructions that the trial court actually gave with respect to the self-defense issue do not misstate the applicable law does not, however, end the inquiry that we must make in order to adequately address defendant's challenge to the trial court's instructions. Instead, we must also determine whether the trial court erred by failing to instruct the jury, in accordance with defendant's request, that he might have regained the right to use defensive force based upon Mr. Bobbitt's reaction to any provocative conduct in which defendant might have engaged. In light of the manner in which we have construed N.C.G.S. § 14-51.4(2)(a), defendant could have only been entitled to the delivery of such an instruction to the extent that his provocative conduct involved non-deadly, rather than deadly, force. A careful review of the record evidence demonstrates, however, the complete absence of any evidence tending to show that defendant was the aggressor using non-deadly, as compared to deadly, force.

The evidence developed at trial presented two contrasting accounts of the events that occurred at the time that defendant shot Mr. Bobbitt. On the one hand, Mr. Bobbitt and the other witnesses who testified on behalf of the State asserted that

defendant approached Mr. Bobbitt with a gun in his hand and fired at Mr. Bobbitt before Mr. Bobbitt could retrieve his own firearm. In the event that the jury believed the testimony offered by the State, defendant was, under the authorities discussed above, an aggressor using deadly force. Defendant, on the other hand, asserted, that, as he stepped toward Mr. Bobbitt with his gun at his side for the purpose of ascertaining if Mr. Bobbitt had assaulted Ms. Mann, Mr. Bobbitt fired at him. In the event that the jury believed defendant's account, defendant was not an aggressor at all. *State v. Spaulding*, 298 N.C. 149, 155-56, 257 S.E.2d 391, 395 (1979) (stating that the fact that the "[d]efendant went out to the [prison] yard, a place where he had a right to be"; that the defendant "did not seek [the victim] out for the purpose of a violent encounter" and did not say "anything to provoke [the victim]"; and that the defendant "repeatedly told [the victim that] he wanted no trouble" tend to show that the defendant "was free from fault in the difficulty"); *State v. Vaughn*, 227 N.C. App. 198, 203, 742 S.E.2d 276, 279-80 (stating that the "[d]efendant's decision to arm herself and leave the vehicle, while perhaps unwise, was not, in and of itself, evidence that she brought on the difficulty"), *disc. rev. denied*, 367 N.C. 221, 747 S.E.2d 526 (2013); *State v. Tann*, 57 N.C. App. 527, 531, 291 S.E.2d 824, 827 (1982) (stating that the fact that the "defendant, who anticipated the confrontation, armed himself with a .38 caliber pistol, and failed to avoid the fight" did "not in any way suggest that [he] was the provocator"). Although defendant asserts that the jury could have understood his conduct in approaching Mr. Bobbitt with his gun by his side while

seeking an answer to his inquiry concerning whether Mr. Bobbitt had harmed Ms. Mann to make him an aggressor without the intent to use deadly force, any such decision on the part of the jury would have been in conflict with established North Carolina law. Thus, the trial court did not err by failing to allow the jury to consider whether defendant could have regained the right to use defensive force even though he had been the aggressor with the intent to use non-deadly force for the simple reason that such an instruction would not have constituted an accurate statement of the law arising upon the evidence. As a result, since the trial court's instructions concerning the law of self-defense were not, in light of the record evidence, erroneous, we reverse the Court of Appeals' decision to vacate defendant's conviction for assault with a deadly weapon inflicting serious injury and remand this case to the Court of Appeals for consideration of defendant's remaining challenge to the trial court's judgment.

REVERSED AND REMANDED.

Justice MORGAN did not participate in the consideration or decision of this case.