STATE OF NORTH CAROLINA v. ANDRE SHARROD SHARPLESS

No. COA11-1343

(Filed 5 June 2012)

**1. Evidence—witness testimony—personal beliefs—not victim's impressions**

The trial court did not err in a felony first-degree murder, attempted robbery with a dangerous weapon, first-degree burglary, and assault with a deadly weapon with intent to kill inflicting serious injury case by allowing a witness to testify regarding the victim's impressions when the victim first opened the door and allegedly struggled with defendant. The witness testified regarding his own beliefs of the sequence of events that took

place at the door between the victim and defendant, not the victim's impression of defendant.

**2. Evidence—hearsay—911 report—anonymous phone call—door not opened**

The trial court erred in a felony first-degree murder, attempted robbery with a dangerous weapon, first-degree burglary, and assault with a deadly weapon with intent to kill inflicting serious injury case by allowing the State to offer into evidence a 911 report, including the phone call of an anonymous citizen that officers should treat the third victim at the hospital, defendant, as a suspect because he had been involved in a narcotics robbery. The anonymous call was hearsay and defendant had not opened the door to the admission of the substance of the anonymous call.

Appeal by defendant from judgments entered 8 March 2011 by Judge Kenneth F. Crow in New Hanover County Superior Court. Heard in the Court of Appeals 3 April 2012.

*Attorney General Roy Cooper, by Special Deputy Attorney General Steven M. Arbogast, for the State.*

*Glover & Petersen, P.A., by Ann B. Petersen, for defendant appellant.*

McCULLOUGH, Judge.

Andre Sharrod Sharpless ("defendant") appeals from his convictions of felony first-degree murder, attempted robbery with a dangerous weapon, first-degree burglary, and assault with a deadly weapon with intent to kill inflicting serious injury ("AWDWITKISI"). Defendant was sentenced to life without parole based on the murder conviction and received sentences of 103 to 133 months for burglary and 116 to 149 months for AWDWITKISI to run consecutively with the murder charge. For the following reasons, we award defendant a new trial.

## I. Background

On the evening of 30 November 2009, at around 6:30 p.m., Tarell Phillips, the victim, and his friend, Kamala Dowd, were at Phillips' house on North 10th Street, Wilmington, North Carolina, when someone knocked on the door. The two had been friends since childhood and were expecting two other friends, who were going to join in watching a football game on television. Phillips got up to answer the

door while Dowd remained seated on the couch, with his back towards the door. Dowd testified at trial that as Phillips opened the door Dowd heard some noise, which he thought was Phillips welcoming someone into the house. However, he then heard Phillips say, "Come on, man," which is when he stood up and turned around thinking Phillips was in danger and was questioning the person at the door.

As he turned around, Dowd saw Phillips "tussling" with a man with dreadlocks who did not have a mask on. Dowd perceived that Phillips was trying to keep the man out of the house. However, at that point, two other men, both wearing bandanas and masks over their faces, barged in. The second intruder then shot Dowd once in the stomach and when Dowd saw the shooter prepare to shoot again he raised his arms to shield himself, which resulted in him getting shot in both wrists by a single shot. Dowd then fell to the floor where he lay still, unable to see anything that was going on. He heard another gunshot, at which point he got up and ran out of the house. He ran around the corner and hid behind a shed where he called 911 to report the shooting. He then called his uncle to pick him up and transport him to the hospital. Dowd was unsure whether he saw two or three men enter Phillips' house because at various times he mentioned the unmasked man who struggled with Phillips, and two masked men, one with a red bandana and the other with a black mask.

During the break-in, Phillips ended up being shot four to five times. He managed to call 911 and was still on the phone when officers arrived. Phillips was transferred to New Hanover Regional Medical Center, where he ultimately died as a result of blood loss.

Defendant testified at trial that on the morning of the murder his girlfriend had driven him to his mother's house. She picked him up around noon and drove him to a friend's house. She also gave him one of her cell phones because the battery had died in his. While at another friend's house, defendant decided that he wanted to buy some marijuana from Phillips, also known by defendant as Rell, from whom he occasionally purchased. Phillips occasionally dealt marijuana to friends for recreational use. Their usual procedure consisted of defendant calling Phillips and placing an order. Then, defendant would call again when he was outside Phillips' house and Phillips would come out to make the exchange.

However, on the day of the murder, because defendant's cell phone battery was dead, he could not call ahead. As a result, he just walked to Phillips' house to knock on the door. When he got to

STATE v. SHARPLESS

[221 N.C. App. 132 (2012)]

Phillips' house, defendant noticed a van parked outside. He knocked on the door of the house and when Phillips answered he asked defendant why he had not called ahead. Phillips told defendant to come in, at which point the two masked men rushed in, pushing defendant into Phillips. Defendant ended up being shot in his right forearm during the intrusion. After being shot, defendant lay on the floor, not far from the front door, until the shooting stopped and he saw the man in the black mask run out the back door. At that point, he proceeded to run out of the house to the nearby home of his friend, Kenneth Gore a/k/a "Little Rell," on North 11th Street, because he lost his girlfriend's cell phone while fleeing and could not call anyone. Gore called defendant's mother and 911 while defendant lay bleeding on Gore's front porch.

Sergeant Kelvin Hargrove responded to the call to Gore's house where he found defendant on the porch. At Phillips' house, investigators recovered several bullets and casings matching a .40 caliber gun and a .38 caliber/.357 magnum gun, meaning there were two shooters. Investigators also used gunshot residue ("GSR") kits on the hands of Phillips, Dowd, and defendant. The GSR kits did not indicate any residue on the hands of Dowd or defendant, but did indicate some on Phillips' hands, from either firing a gun or being in close proximity to the firing of one. Investigators finally took blood swabs from the front door, living room, hallway, and first bedroom where Phillips was found. A swab from the hallway matched defendant's blood. Defendant gave three interviews to police, one at the hospital, and two at the police station, with his being arrested after the third interview on 3 December 2009.

While in the county jail, defendant was placed in the same pod as Tige Utley. Utley had been in the jail since October 2009 on a series of charges, of which if convicted he would face a sentence greater than his life expectancy. In the first week of January 2010, Utley sent a letter to the New Hanover County District Attorney, mentioning that he had useful information regarding the charges against defendant. He claimed that while the two were in the same pod, defendant told Utley about his role in the murder, armed robbery, and home invasion. Utley sought a concession in his charges in exchange for testifying against defendant. He received a plea bargain from an assistant district attorney, but later wrote the district attorney saying that the concessions were not enough. The parties eventually reached an agreement which consolidated Utley's charges into a single judgment of 36 to 53 months in addition to any time received from three indictments for possession of heroin with intent to sell and deliver.

At trial, Utley testified that he and defendant were in the recreation yard when defendant asked him what he knew about GSR testing. Utley told defendant that he was familiar with the testing, however, he could not explain the procedure at trial. Utley claimed defendant told him that he was interested in the subject because he was waiting for results. Defendant stated to Utley that he had not shot anyone, but had actually been shot. Defendant testified that he never had this discussion with Utley.

In another instance, Utley, defendant, and another inmate named Dwayne Burton, were sitting in a holding cell on 17 December 2009. Utley claimed that he overheard defendant tell Burton that he needed some money and that these two guys had offered to pay defendant to knock on Phillips' door so they could gain entry. According to Utley, defendant went to Phillips' house with two guys, one known as Hell Rell. Defendant also allegedly told Burton that he had pulled a gun on Phillips, Phillips wrestled it away from him, and the other guy reached over defendant and shot Phillips. Allegedly, defendant got some marijuana out of the robbery, but not everything that he wanted because it all happened too quickly. Defendant remembered being in the holding cell that day with Utley and Burton, but denied ever talking to the two of them. James Oxendine also testified at the trial that he had been in the holding cell with the three other men, but that he never heard defendant discuss the shooting. Oxendine testified that the cell was so small that it was not possible to have a private conversation and that he and defendant had actually talked about defendant's attorney because he had previously been represented by her.

Utley testified to a final instance, a week later, where he was seated next to defendant during visitation. Defendant was talking to his sister and Utley to his mother. Utley testified that he heard defendant tell his sister not to worry because the GSR results showed he did not fire a gun and for her to also get word to Hell Rell that everything was all right. Visitation logs showed that defendant did meet with his sister around that time, and that Utley was not in the visitation area at the same time. The visitation logs did show that Utley and defendant were at visitation together at one point, but that was prior to the two being in the holding cell together and defendant had actually been talking to his girlfriend at that time. Defendant's sister testified that the two had talked about Christmas and defendant's girlfriend. Furthermore, defendant's sister testified that they did not discuss their cousin Titus Grady, otherwise known as Hell Rell.

Also at trial, Deborah Cottle, Deputy Director of the New Hanover County 911, testified to computer generated reports from the night of the shooting. The reports included a "be on the lookout" ("BOLO") call from police, describing the suspect as a black male wearing a red hoodie or sweater with blue jeans and white tennis shoes. Cottle further testified, over objection, to information regarding a call, four and half hours later, from an anonymous citizen alerting authorities to the possibility that the third individual shot and taken to the hospital, meaning defendant, should also be considered a suspect in the shooting.

On 11 January 2010, a New Hanover County grand jury returned two indictments against defendant charging him with five crimes: (1) AWDWITKISI on Dowd; (2) attempted murder of Dowd; (3) murder of Phillips; (4) first-degree burglary of a dwelling house while it was occupied by Phillips and Dowd; and (5) robbery with a firearm of drugs and money from Phillips and Dowd. The charges were consolidated and came up for trial on 21 February 2011. At the close of evidence the State dismissed the attempted murder charge, but the charge of murder was submitted to the jury on the theory of felony murder. The jury returned guilty verdicts on 8 March 2011, for which defendant received a sentence of life without parole on the murder charge to run consecutively with sentences of 103 to 133 months on the burglary and robbery charges and 116 to 149 months on the AWDWITKISI charge. The same day the trial court arrested judgment on the robbery charge, but reimposed the sentence on the burglary charge. Defendant gave oral notice of appeal.

## II. Analysis

### A. Admission of Dowd's Testimony

[1] Defendant raises two issues on appeal, with his first being that the trial court erred in allowing Dowd to testify regarding Phillips' impressions when Phillips first opened the door and allegedly struggled with defendant. Defendant contends that Dowd did not have direct personal knowledge of Phillips' impressions of the man at the door, as Phillips was the only person with personal knowledge of his own thoughts. We disagree.

"[W]hether a lay witness may testify as to an opinion is reviewed for abuse of discretion." *State v. Washington*, 141 N.C. App. 354, 362, 540 S.E.2d 388, 395 (2000). "A trial court abuses its discretion if its determination is 'manifestly unsupported by reason' and is 'so arbitrary that it could not have been the result of a reasoned decision.' "

*State v. Lasiter*, 361 N.C. 299, 301-02, 643 S.E.2d 909, 911 (2007) (quoting *White v. White*, 312 N.C. 770, 777, 324 S.E.2d 829, 833 (1985)). "In our review, we consider not whether we might disagree with the trial court, but whether the trial court's actions are fairly supported by the record." *Id.* at 302, 643 S.E.2d at 911. "Evidentiary errors are harmless unless a defendant proves that absent the error a different result would have been reached at trial." *State v. Ferguson*, 145 N.C. App. 302, 307, 549 S.E.2d 889, 893 (2001). "The purpose of Rule 602 is to prevent a witness from testifying to a fact of which he has no direct personal knowledge[,]" *State v. Cole*, 147 N.C. App. 637, 645, 556 S.E.2d 666, 671 (2001), and " '[p]ersonal knowledge is not an absolute but may consist of what the witness thinks he knows from personal perception.' " *State v. Poag*, 159 N.C. App. 312, 323, 583 S.E.2d 661, 669 (2003) (quoting N.C. Gen. Stat. § 8C-1, Rule 602, official commentary (1999)).

Defendant first argues that the trial court erred in allowing Dowd to testify regarding Phillips' perceptions as Phillips opened the door to his home on the evening of the shooting. Defendant acknowledges that Dowd's own impressions of the struggle at the door are admissible lay opinion, but he claims that any testimony by Dowd regarding Phillips' impressions were not helpful for a clear understanding of Dowd's testimony or any fact at issue. As stated above, "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter." N.C. Gen. Stat. § 8C-1, Rule 602 (2011). Where a

> witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

N.C. Gen. Stat. § 8C-1, Rule 701 (2011). Moreover, " '[o]pinion evidence is generally inadmissible "whenever the witness can relate the facts so that the jury will have an adequate understanding of them and the jury is as well qualified as the witness to draw inferences and conclusions from the facts." ' " *State v. Watson*, 294 N.C. 159, 165, 240 S.E.2d 440, 445 (1978) (quoting *State v. Lindley*, 286 N.C. 255, 257, 210 S.E.2d 207, 209 (1974)).

In making this argument, defendant contends that Phillips' perception of the person at the door is a critical issue of fact within the case and is inadmissible under Rule 602 because the State did not pre-

sent evidence that Dowd had personal knowledge of Phillips' impressions while at the front door. Furthermore, defendant argues Dowd did not testify in the form of an opinion, but plainly stated that Phillips questioned the man at the door, did not welcome him into the house, and thought the man was coming in to do harm. According to defendant, Dowd did not have personal knowledge of the situation as his back was to the door. Dowd did not see the situation until he stood up and turned around to see defendant already lying on top of Phillips.

Consequently, defendant argues Dowd could describe everything that happened, but the jury was just as well qualified as Dowd to draw any inferences as to what Phillips perceived during the intrusion, based on the facts elicited at trial. Along these lines, defendant claims Dowd's testimony was a "meaningless assertion" which did not warrant inclusion, because it was of little assistance to the jury. Defendant cites to two cases from our Supreme Court where it ruled certain opinion evidence to have been improperly allowed, but we do not believe either case applies to this case. First, defendant cites to *Watson*, 294 N.C. 159, 240 S.E.2d 440, where a witness did not observe the robbery, but testified that the "defendant had robbed the station[.]" *Id.* at 165, 240 S.E.2d at 445. Although, in the case at hand, Dowd may not have visually observed the altercation at the door, he did hear what went on. Clearly, that is sufficient to distinguish this case from *Watson*. Additionally, defendant cites to *State v. Cuthrell*, 233 N.C. 274, 63 S.E.2d 549 (1951), where a witness testified that a building had been " 'set afire,' " yet the witness had not arrived at the scene until after the fire had been put out. *Id.* at 275, 63 S.E.2d at 550. Again, the present case differs in that Dowd observed the situation by listening in on what happened with Phillips at the front door. Either way, defendant contends the incorrect admission of Dowd's testimony warrants reversal because there is a possibility that a different result would have been reached had Dowd's testimony not been admitted. *See* N.C. Gen. Stat. § 15A-1443(a) (2011).

The State, alternatively, argues the trial court properly allowed Dowd's testimony because the testimony related to his personal observations and not to those of Phillips. At trial, Dowd testified that he thought Phillips was welcoming someone into the house, "[b]ut [he] realized quickly that it was like a tussle[,]" and then he heard Phillips say, "Come on, man." Dowd was then asked how he perceived the manner in which Phillips made the comment to which he responded by stating, "[i]t put me in the vibe of that he was in danger

and he was kind of questioning like whoever the guy was, what is he doing, you know." Defendant objected to this final statement, but the trial court overruled it relying on the State's claims that Dowd was clearly stating his personal observations of the situation. Dowd went on to state that he thought it was a tussle at the door "because [Phillips] wasn't welcoming him into his house, he was checking his door to see who it was." Defendant again objected, but it was again overruled. Finally, Dowd testified that Phillips "was checking his door to see who it was but once he opened the door, he seen that the guy was trying to come in to cause harm so he was trying to close the door." Once again defendant objected, but the trial court again overruled it.

The State contends that even if Dowd's testimony encompassed some beliefs or conclusions regarding Phillips' state of mind, the testimony was based on Dowd's personal observations and knowledge. Under Rule 602, there was "evidence [] introduced sufficient to support a finding that [Dowd] has personal knowledge of the matter." N.C. Gen. Stat. § 8C-1, Rule 602. Likewise, as stated above, " "'personal knowledge is not an absolute but may consist of what the witness thinks he knows from personal perception.'" " *State v. Wilkerson*, 363 N.C. 382, 414, 683 S.E.2d 174, 194 (2009), *cert. denied*, ____ U.S. ____, 176 L. Ed. 2d 734 (2010) (quoting N.C. Gen. Stat. § 8C-1, Rule 602, official commentary). Dowd merely gave his understanding and interpretation of what went on at the door based on his sitting in the next room and being able to hear the whole situation.

> "The instantaneous conclusions of the mind as to the appearance, condition, or mental or physical state of persons, animals, and things, derived from observation of a variety of facts presented to the senses at one and the same time, are, legally speaking, matters of fact, and are admissible in evidence."

*State v. Lloyd*, 354 N.C 76, 109, 552 S.E.2d 596, 620 (2001) (quoting *State v. Leak*, 156 N.C. 643, 647, 72 S.E. 567, 568 (1911) (citation omitted)). Consequently, Dowd testified regarding his own beliefs of the sequence of events that took place at the door between Phillips and the unmasked man, and it was not error for the trial court to admit Dowd's testimony at trial.

### B. Admission of Anonymous Call

[2] Defendant's second argument on appeal is that the trial court erred in allowing the State to offer into evidence the 911 report,

including the phone call of an anonymous citizen that officers should treat the third victim at the hospital as a suspect because he had been involved in a narcotics robbery. Specifically, defendant contends the anonymous call was hearsay and thus incompetent evidence. We agree.

" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered into evidence to prove the truth of the matter asserted." N.C. Gen. Stat. § 8C-1, Rule 801(c) (2011). Generally, the statement of a declarant is inadmissible at trial where the declarant is unavailable to serve as a witness. *See* N.C. Gen. Stat. § 8C-1, Rule 804(a) (2011). However, " '[e]vidence which might not otherwise be inadmissible against a defendant may become admissible to explain or rebut other evidence put in by the defendant himself.' " *State v. Maynard*, 311 N.C. 1, 28, 316 S.E.2d 197, 212 (1984) (quoting *State v. Small*, 301 N.C. 407, 436, 272 S.E.2d 128, 145-46 (1980)). Nevertheless, this does not give the State *carte blanche* to offer incompetent evidence. *See State v. Lynch*, 334 N.C. 402, 412-13, 432 S.E.2d 349, 354-55 (1993). We review the admission of otherwise inadmissible evidence, where the defendant first opened the door for abuse of discretion. *See State v. McClary*, 157 N.C. App. 70, 79, 577 S.E.2d 690, 696 (2003).

Defendant contends his constitutional rights were violated by not being able to cross-examine the anonymous caller at trial, in violation of the Confrontation Clause as established in *Crawford v. Washington*, 541 U.S. 36, 158 L. Ed. 2d 177 (2004), and *Davis v. Washington*, 547 U.S. 813, 165 L. Ed. 2d 224 (2006). Furthermore, defendant admits that information regarding the BOLO of a suspect wearing a red hoodie or sweater was accurate, as it was taken directly from the 911 log, but he contends the anonymous call, which came four and a half hours after the initial BOLO, did not relate any information explaining the reason for the BOLO. As a result, defendant argues there is a real possibility that evidence of the call influenced the jury, and had it not been allowed in as evidence, there is a reasonable possibility that a different result would have occurred.

On the other hand, the State claims defendant opened the door to the admission of the 911 call from the unknown caller. Debra Cottle briefly testified in the State's case-in-chief, but not about the unidentified 911 call suggesting defendant's involvement in a narcotics robbery. Defendant subsequently recalled Ms. Cottle and questioned her regarding the shooting of Phillips. At defendant's request, Ms. Cottle had prepared the report of all the 911 calls, which contained the initial BOLO describing a "black male, red hoodie or sweater, blue

jeans, white tennis shoes, suspect." On cross-examination she testified that the BOLO did not give its source or how it was obtained. Then, over objection, Ms. Cottle testified that there was another call regarding the shooting from an unidentified citizen. The call was "[a]dvising that a third victim that came to the hospital with the shooting was involved in some type of 1098," which is a narcotics robbery, and that he was "possibly the suspect in the whole thing. 1083." Furthermore, Ms. Cottle added that the person "didn't have or wouldn't divulge solid details. Just wanted to let detectives know the word on the street so they could look at the third victim as a suspect."

"[A] trial court may permit otherwise inadmissible evidence to be admitted if the opposing party opens the door through cross-examination of the witness." *State v. Thaggard*, 168 N.C. App. 263, 273, 608 S.E.2d 774, 782 (2005). " 'Opening the door' is the principle where one party introduces evidence of a particular fact and the opposing party may introduce evidence to explain or rebut it, even though the rebuttal evidence would be incompetent or irrelevant, if offered initially." *Id.* " '[T]he law wisely permits evidence not otherwise admissible to be offered to explain or rebut evidence elicited by the defendant himself.' " *State v. Garner*, 330 N.C. 273, 290, 410 S.E.2d 861, 870 (1991) (alteration in original) (quoting *State v. Albert*, 303 N.C. 173, 177, 277 S.E.2d 439, 441 (1981)). The State recognizes that the later call is inadmissible hearsay, which is the reason it did not elicit the testimony during its case-in-chief. However, it contends defendant opened the door by creating the impression that the police had not developed or received any information leading them to view defendant as a suspect. Defendant had the crime scene technician testify that it collected clothing from where defendant was located consisting of a black shirt and black hoodie, while the BOLO description was different. The State elicited the anonymous phone call to refute and rebut defendant's allegedly misleading impression that he could not have been involved in the crime.

While defendant may have opened the door to the admission of further evidence regarding his potential involvement in the robbery, we do not believe defendant opened the door to the admission of the substance of improper hearsay statements.

> Generally, much latitude is given counsel on cross-examination to test matters related by a witness on direct examination. *State v. Burgin*, 313 N.C. 404, 329 S.E.2d 653 (1985). The scope of cross-examination is subject to two limitations: (1) the discretion

of the trial court; and (2) the questions offered must be asked in good faith. *State v. Dawson,* 302 N.C. 581, 585, 276 S.E.2d 348, 351 (1981).

*State v. Warren,* 327 N.C. 364, 373, 395 S.E.2d 116, 121-22 (1990). Here, the State admitted that the anonymous phone call amounted to hearsay, yet it still elicited evidence regarding the call for the truth of the matter asserted. The anonymous tip included allegations that defendant was part of a trio involved in a particular narcotics robbery, but there was no other evidence to substantiate these claims. The State could have certainly elicited at trial that there was an anonymous call that rebutted the initial BOLO, but we believe it was prejudicial for the State to elicit the substance of the call, which improperly created an image for the jury of defendant as a person involved in a narcotics robbery gone awry. Thus, the trial court abused its discretion in allowing the admission of the substance of the anonymous call over defendant's objection such that there is a probability that the jury might have otherwise reached a different verdict. Consequently, we must reverse on this issue and remand for a new trial.

Reversed and remanded for a new trial.

Chief Judge MARTIN and Judge BRYANT concur.