An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA13-794

NORTH CAROLINA COURT OF APPEALS

Filed: 4 February 2014

STATE OF NORTH CAROLINA

    v.

JOHN DARREN BULLARD

Robeson County
Nos. 06 CRS 013731, 013733

Appeal by defendant from judgments entered 5 June 2012 by Judge Robert F. Floyd, Jr. in Robeson County Superior Court. Heard in the Court of Appeals 20 November 2013.

    *Attorney General Roy Cooper, by Assistant Attorney General Mary Carla Hollis, for the State.*

    *Kevin P. Bradley, for defendant-appellant.*

    HUNTER, JR., Robert N., Judge.

John Darren Bullard ("Defendant") appeals from judgments after a jury trial finding him guilty of second-degree murder and of discharging a weapon into occupied property. Defendant contends that the trial court committed reversible error in denying his request for a jury instruction on self-defense and in making other evidentiary decisions at trial. For the following reasons, we disagree and find no error.

## I.    Factual & Procedural History

On 5 June 2012, Defendant was convicted of second-degree murder and of discharging a firearm into occupied property.  The evidence presented at Defendant's trial tended to show the following.

On 17 September 2006, Officer Greg Chavis ("Officer Chavis") of the Pembroke Police Department was dispatched to investigate a reported shooting at the Spirit gas station in Pembroke.  Upon arrival, Officer Chavis received information that a person had been shot and that the person was at a nearby McDonald's.  When Officer Chavis arrived at the McDonald's, he observed Defendant pacing back and forth outside of a Hummer, acting belligerent, and using profanity with someone on a cell phone.  Defendant was shirtless and had pellet wounds on his upper torso.  Defendant told the person on the other end of the line that "he didn't care how much money that it took, . . . he was going to kill somebody."  Officer Chavis testified that Defendant was "very mad" and "pissed off," and that Defendant kept saying that he was going to kill somebody.

Raymond Hunt ("Hunt"), who was with Defendant during the shooting, testified that he and Defendant had pulled into the Spirit gas station that night and encountered Christopher

Locklear[1] ("Locklear") and his entourage. Hunt testified that Locklear and Defendant got into an argument that resulted in Locklear's group pulling guns out and "closing in" on Defendant. Fearing for his and Defendant's life, Hunt testified that he grabbed an AK-47 from the back of the Hummer and sprayed a couple of rounds into the air and told Locklear's group to back off. Defendant and Hunt then got into the Hummer, which Hunt testified was subsequently shot up by Locklear and his entourage. Defendant and Hunt both sustained injuries from birdshot during the incident. Thereafter, Defendant and Hunt drove to the McDonald's and called an ambulance. Locklear's testimony regarding the incident generally confirmed that there was an argument with Defendant, but Locklear denied shooting at Defendant and claimed that Defendant and Hunt were the aggressors.

Locklear indicated that problems with Defendant started on the night before the Spirit gas station incident. Specifically, Locklear testified that he was riding in a car with Defendant's ex-girlfriend when Defendant stopped the car and attempted,

---

[1] Persons identified in this opinion with the surname "Locklear" have no familial relationship with one another. To avoid confusion, other Locklears will be introduced using their full name and abbreviated subsequently using their first name or initials.

unsuccessfully, to take his ex-girlfriend with him. Testimony indicated that one of Defendant's friends, Cashley Scott ("Scott") fired shots into the air as Locklear's car was driving away. Locklear testified that the incident with Defendant's ex-girlfriend precipitated the argument at the Spirit gas station.

Notwithstanding these incidents, the animus between Defendant and Locklear was allegedly settled. Sometime after the shooting at the Spirit gas station, Locklear testified that he ran into Defendant at McDonald's where the two discussed what had happened and attempted to resolve their conflict.

Nearly a month after the shooting incident at the Spirit gas station, in the early morning hours of 15 October 2006, Locklear was cruising in Pembroke with a group of friends including his girlfriend, Kayla Deese ("Deese"), his friends Billy Hammonds ("Hammonds") and Tommy Kurt Lloyd ("Lloyd"), and Lloyd's girlfriend, Crystal Locklear ("Crystal"). Hammonds drove Locklear's 1999 GMC Envoy. Locklear was riding in the front passenger seat while Lloyd, Crystal, and Deese rode in the backseat. Everyone in the group had been drinking.

On the same night, Defendant was also driving through Pembroke with some friends in a Cadillac Escalade. Defendant, Hunt, Scott, and Joshua Locklear ("J.L.") had been to the

Player's Club in nearby Lumberton with a group of women and were on their way back home. Defendant was driving, J.L. was in the front passenger seat, and Hunt and Scott rode in the backseat. The women rode behind the Escalade in a Cadillac CTS sedan. On their way home, the women lost sight of Defendant and the Escalade, so they pulled off to make a telephone call and to use the bathroom.[2]

Meanwhile, as Defendant drove the Escalade into Pembroke, he passed Locklear's Envoy on Union Chapel Road. Deese testified that when Locklear and the group riding in the Envoy saw Defendant's Escalade, Hammonds said "[t]here's that truck, you all. There's them boys." Deese testified that upon hearing Hammonds' words, Locklear said, "No, it's straight. We got it straight with them." Locklear testified that he thought everything was "cool" with Defendant because they had come to an agreement with each other during their previous discussion.

Upon seeing Locklear, however, testimony indicated that Defendant and Hunt became angry and "a little rowdy." Defendant turned the Escalade around, and using back roads, doubled back

---

[2] Testimony at trial revealed that the women were not present for the ensuing events and that they rejoined Defendant's group at a later point in time.

through town in the direction that Locklear's Envoy was traveling.

Locklear's Envoy eventually reached the edge of town, so Hammonds turned around at a convenience mart to head back into Pembroke. When Locklear's group turned around, they noticed Defendant's Escalade sitting at a stop sign right off the main road. Locklear testified that he was "shocked" to see Defendant's Escalade sitting at the stop sign and thought there might be trouble. Locklear testified that because of the police presence in Pembroke, it would be better to head back into town. Deese testified she told Crystal "let's get down." Hammonds testified that he was scared because he didn't know what Defendant's group was capable of.

Locklear testified that after they passed by Defendant, Defendant's Escalade pulled out and got behind their vehicle. As Defendant's Escalade got closer, Locklear began to hear bottles hitting the road near the Envoy. Locklear testified that they turned off the main road and began to hear gunshots. Thereafter, the Envoy's back window shattered and Lloyd and Crystal were shot. Locklear testified that he grabbed a .25 caliber pistol, stuck the gun out of the window, and fired several rounds to let Defendant know that he was armed and to

prevent Defendant from ambushing the Envoy. After Locklear returned fire, he testified that Defendant's Escalade fled the scene.

Deese testified similarly. She recalled hearing the bottles shatter outside the Envoy, turning off the main road, coming to a stop, and hearing gunshots. Deese testified that after the Envoy sustained gunshots the group checked to see if anyone was harmed, at which point Crystal said "[i]'ve been shot," and fell over into Deese's lap. Deese testified that she didn't see anyone in the Envoy return fire on Defendant's Escalade.

Likewise, Hammonds also testified that the Envoy sustained gunshot fire as he turned onto the side road. Hammonds indicated that when the shots began, he ducked down to avoid injury. Hammonds did not see Locklear return fire on the Escalade.

Lloyd testified that Defendant's Escalade got right behind the Envoy and that Defendant's group was hanging out of the Escalade attempting to throw beer bottles at them. When the gunshots began, Lloyd looked back and the back windshield shattered in his face. Lloyd was shot in the arm and reported

being in shock. As a result, he was unable to recall whether Locklear returned fire.

Hunt, Scott, and J.L., who were riding with Defendant in the Escalade, also testified about the shooting.[3] Hunt testified that after seeing Locklear's Envoy, Defendant stated something to the effect of "I ought to shoot these boys" or "I want to shoot them" or "you think I'll shoot them[?]" Hunt testified that he then heard gunfire from two different guns. When the gunshots began, Hunt testified that he laid down in the Escalade to avoid injury. Hunt did not report seeing any gunfire, but indicated that the shots he heard were "[v]ery, very close."

Scott testified that after the Escalade got behind the Envoy, he heard gunshots coming from inside his vehicle and saw Defendant's arm hanging out of the window with a gun in his hand. On cross-examination it was revealed that Scott previously told law enforcement that he could not tell who shot first because he heard the gunshots "all together."

J.L. testified, "[Defendant] grabbed a gun out of the middle of the console and I heard gunshots. There was gun fired out [sic] my truck. My truck got hit. And I just—when I seen a gun, I just laid down in the passenger side." When asked when

---

[3] Hunt, Scott, and J.L. were the State's witnesses. Defendant did not testify and produced no witnesses on his behalf.

the Escalade was hit with gunfire, J.L. said "[d]uring when all this was going on.  It was like, you know, pretty much when all this was going on—the shooting and everything was going on." Evidence collected at the scene indicated that both vehicles sustained gunshot damage.

After the shootout, Locklear's group attempted to get Crystal medical attention, but she stopped breathing on the way to the hospital.  The medical examiner testified that Crystal died of a single gunshot to the right side of her back that had lodged in her chest.

Officer Tony Locklear ("Officer T.L.") was in the area during the shootout and heard the shots being fired.  Upon hearing the shots, Officer T.L. pulled out of the parking lot he was in, radioed dispatch, and headed toward the area where he heard the shots.  While en route, Officer T.L. passed Defendant's Escalade heading in the opposite direction.  Officer T.L. recognized the Escalade as the vehicle that Defendant normally drove.  Over Defendant's objection, Officer T.L. testified that he notified Officer Chavis that Defendant "just passed me" and that Defendant had "probably been involved in some type of shooting."

Based on the foregoing evidence, defense counsel requested a jury instruction concerning self-defense and voluntary manslaughter. The trial court denied defense counsel's request. Following his convictions, Defendant gave notice of appeal in open court.

## II. Jurisdiction

Defendant's appeal from the superior court's final judgments lies of right to this Court pursuant to N.C. Gen. Stat. §§ 7A-27(b), 15A-1444(a) (2013).

## III. Analysis

Defendant's appeal raises three questions for this Court's review: (1) whether the trial court erred in refusing to instruct the jury on theories of perfect and imperfect self-defense; (2) whether the trial court committed reversible error in allowing testimony by Officer T.L. that Defendant had "probably been involved in some type of shooting;" and (3) whether the trial court committed reversible error by not allowing Defendant to impeach Officer T.L.'s testimony by inquiring into his termination from the police department. We address each in turn.

## A. Failure to Provide Jury Instructions on Self-Defense

Defendant contends that the trial court erred in refusing to instruct the jury on theories of perfect and imperfect self-defense and in refusing to submit voluntary manslaughter as a lesser-included offense.[4]  "[Arguments] challenging the trial court's decisions regarding jury instructions are reviewed *de novo* by this Court."  *State v. Osorio*, 196 N.C. App. 458, 466, 675 S.E.2d 144, 149 (2009).  "'Under a *de novo* review, the court considers the matter anew and freely substitutes its own judgment' for that of the lower tribunal."  *State v. Williams*, 362 N.C. 628, 632–33, 669 S.E.2d 290, 294 (2008) (quoting *In re Greens of Pine Glen, Ltd. P'ship*, 356 N.C. 642, 647, 576 S.E.2d 316, 319 (2003)).

"The [trial court] is required to charge [the jury] on all substantial and essential features of a case which arise upon the evidence even absent a special request for the instruction."  *State v. Deck*, 285 N.C. 209, 214-15, 203 S.E.2d 830, 834 (1974); *see also*

---

[4] Defendant's requested submission of voluntary manslaughter as a lesser-included offense is predicated on his imperfect self-defense theory.  *See State v. Ross*, 338 N.C. 280, 283, 449 S.E.2d 556, 559 (1994) ("There are two types of self-defense: perfect and imperfect.  Perfect self-defense excuses a killing altogether, while imperfect self-defense may reduce a charge of murder to voluntary manslaughter." (internal citation omitted)).  Thus, whether the trial court erred in refusing to submit voluntary manslaughter as a lesser-included offense depends on whether the evidence supports Defendant's imperfect self-defense theory.  *Cf. State v. Millsaps*, 356 N.C. 556, 561, 572 S.E.2d 767, 771 (2002) ("An instruction on a lesser-included offense must be given only if the evidence would permit the jury rationally to find defendant guilty of the lesser offense and to acquit him of the greater.").

*State v. Bogle*, 324 N.C. 190, 195, 376 S.E.2d 745, 748 (1989) ("Failure to instruct upon all substantive or material features of the crime charged is error."). "When supported by competent evidence, self-defense unquestionably becomes a substantial and essential feature of a criminal case." *Deck*, 285 N.C. at 215, 203 S.E.2d at 834. Furthermore, "[w]hen determining whether the evidence is sufficient to entitle a defendant to jury instructions on a defense or mitigating factor, courts must consider the evidence in the light most favorable to defendant." *State v. Oliver*, 334 N.C. 513, 520, 434 S.E.2d 202, 205 (1993) (quotation marks and citation omitted).

Thus, the question presented to this Court is whether, viewing the facts in a light most favorable to Defendant, the evidence at trial was sufficient to invoke the doctrine of self-defense and support a jury instruction on that doctrine. For the following reasons, we hold that Defendant was not entitled to an instruction on either perfect or imperfect self-defense and find no error with the trial court's decision.

A defendant is entitled to an instruction on perfect self-defense as an excuse for a killing when it is shown that, at the time of the killing, the following four elements existed:

> (1) it appeared to defendant and he believed it to be necessary to kill the deceased in order to save himself from death or great bodily harm; and

> (2) defendant's belief was reasonable in that the circumstances as they appeared to him at the time were sufficient to create such a belief in the mind of a person of ordinary firmness; and
>
> (3) defendant was not the aggressor in bringing on the affray, i.e., he did not aggressively and willingly enter into the fight without legal excuse or provocation; and
>
> (4) defendant did not use excessive force, i.e., did not use more force than was necessary or reasonably appeared to him to be necessary under the circumstances to protect himself from death or great bodily harm.

*State v. Williams*, 342 N.C. 869, 873, 467 S.E.2d 392, 394 (1996)

(quotation marks and citations omitted).

> On the other hand, if defendant believed it was necessary to kill the deceased in order to save [himself] from death or great bodily harm, and if defendant's belief was reasonable in that the circumstances as they appeared to [him] at the time were sufficient to create such a belief in the mind of a person of ordinary firmness, but defendant, although without murderous intent, was the aggressor in bringing on the difficulty, or defendant used excessive force, the defendant under those circumstances has only the *imperfect right of self-defense*, having lost the benefit of perfect self-defense, and is guilty at least of voluntary manslaughter.

*State v. Wilson*, 304 N.C. 689, 695, 285 S.E.2d 804, 808 (1982)

(quotation marks and citations omitted).

> An imperfect right of self-defense is thus available to a defendant who reasonably believes it necessary to kill the deceased to save himself from death or great bodily harm even if defendant (1) might have brought on the difficulty, provided he did so *without* murderous intent, and (2) might have used excessive force. Imperfect self-defense therefore incorporates the first two requirements of perfect self-defense, but not the last two.

*State v. Mize*, 316 N.C. 48, 52, 340 S.E.2d 439, 441–42 (1986). However, if the defendant brings on the difficulty *with* murderous intent—that is, " with the intent to take life or inflict serious bodily harm[—]he is not entitled even to the doctrine of imperfect self-defense; and if he kills during the affray he is guilty of murder." *Id.* at 52, 340 S.E.2d at 442 (quotation marks and citations omitted).

Here, Defendant is not entitled to an instruction on perfect or imperfect self-defense. The only permissible inference from the evidence presented at trial is that Defendant instigated the 15 October 2006 shootout with murderous intent. After the incident at the Spirit gas station, Officer Chavis heard Defendant tell someone over the phone that "he didn't care how much money that it took, . . . he was going to kill somebody." Moreover, the collective testimony by the occupants of Locklear's Envoy and Defendant's Escalade establish that upon

seeing Locklear's Envoy, Defendant got "a little rowdy," turned the Escalade around, and used back roads to pursue Locklear. Uncontroverted testimony also indicated that Defendant pulled the Escalade up behind Locklear's Envoy and that bottles were thrown in the Envoy's direction.

Furthermore, Defendant did not testify or produce witnesses on his behalf and none of the State's evidence suggests that Locklear fired at Defendant first. Testimony by Locklear, Deese, Hammonds, and Lloyd indicated that Defendant fired first, injuring Lloyd and fatally injuring Crystal in the process. Nevertheless, Defendant directs our attention to testimony by Hunt, Scott, and J.L., who indicated that they heard two guns being fired and that the shots seemed to occur "all together." However, even in isolation, this testimony does not permit the inference that Locklear instigated the shootout. At best, the evidence fails to establish who fired first. Furthermore, other testimony by Hunt, Scott, and J.L. suggests that Defendant shot first. Hunt testified that upon seeing Locklear's Envoy, Defendant stated something to the effect of "I ought to shoot these boys" or "I want to shoot them" or "you think I'll shoot them[?]" and then Hunt immediately heard gunfire. Scott indicated that after the Escalade got behind the Envoy, he heard

gunshots coming from inside his vehicle and saw Defendant's arm hanging out of the window with a gun in his hand.  When asked if there had been any altercation that night between the occupants of Locklear's Envoy and Defendant's Escalade prior to Defendant shooting, J.L. said "[n]ot that night, no."

In summary, the evidence presented at trial showed that Defendant instigated the 15 October 2006 shootout with murderous intent.  Furthermore, Defendant presented no evidence on his behalf to rebut such evidence.  Accordingly, the trial court did not err in refusing to instruct the jury on theories of perfect and imperfect self-defense nor in refusing to submit voluntary manslaughter as a lesser-included offense.

**B. Evidentiary Objection to Officer T.L.'s Testimony**

The second question presented to this Court by Defendant's appeal is whether the trial court committed reversible error when it allowed testimony from Officer T.L., over Defendant's objection, that Defendant had "probably been involved in some type of shooting."  Defendant contends that there was no foundation for Officer's T.L.'s statement and that he was speculating regarding an event to which he had no personal knowledge.  We disagree.

"[W]hether a lay witness may testify as to an opinion is reviewed for abuse of discretion. A trial court abuses its discretion if its determination is manifestly unsupported by reason and is so arbitrary that it could not have been the result of a reasoned decision." *State v. Sharpless*, ___ N.C. App. ___, ___, 725 S.E.2d 894, 898 (2012) (quotation marks and citations omitted) (alteration in original). Furthermore, "we consider not whether we might disagree with the trial court, but whether the trial court's actions are fairly supported by the record." *Id.* at ___, 725 S.E.2d at 899. A defendant is prejudiced by evidentiary errors when he can demonstrate that there "is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises." N.C. Gen. Stat. § 15A-1443(a) (2013).

Under our rules of evidence, a witness "may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter." N.C. R. Evid. 602. "The purpose of Rule 602 is to prevent a witness from testifying to a fact of which he has no direct personal knowledge. [P]ersonal knowledge is not an absolute but may consist of what the witness thinks he knows from personal

perception." *State v. Cole*, 147 N.C. App. 637, 645, 556 S.E.2d 666, 671 (2001) (quotation marks and citations omitted) (alteration in original). *See also* N.C. R. Evid. 701 (requiring lay opinion testimony to be "rationally based on the perception of the witness").

Here, Officer T.L., who was in the area at the time of the shooting, testified as follows:

> [Officer T.L.:]      I know when I heard the shots with my windows being down and the buildings behind to the left and to the right of me, I knew it was on my side in my general area. I wasn't sure if it come [sic] from the left side or the right side.

> [Questioner:]      And so what did you do?

> [Officer T.L.:]      I immediately got on the radio and notified dispatch and any other officers that were listening, whether it be campus police or Sheriff's Department and [Officer] Chavis that it had been shots fired and I'd be attempting to locate over on Union Chapel Road.

> [Questioner]:      So what did you do?

> [Officer T.L.:]      I pulled out and made a left, went to the end of

Union Chapel Road to the stop sign, made a U-turn, didn't see any traffic, made a U-turn, come back up Union Chapel Road. At that time I had passed a black Cadillac Escalade and a Cadillac car which was following the Escalade. I notified [Officer] Chavis that the vehicle that [Defendant] normally drove, which was the Cadillac, had just passed me, he'd probably been involved in some type of shooting, and I was riding down Union Chapel Road--

[Defense Counsel:] Objection. Move to strike. There's no foundation for that from this witness.

Upon review of this record, we find no error with the trial court's decision to allow this testimony. First, as is clear from the form of the question, Officer T.L. was recounting what he did in response to hearing gunshots in his general vicinity. As such, Officer T.L. was not offering a lay opinion as to Defendant's guilt. Second, assuming *arguendo* that Officer T.L.'s testimony was admitted in error, Defendant cannot establish that such error was prejudicial. At most, Officer

T.L.'s testimony indicates an uncontroverted fact—that Defendant was involved in the shooting.

Accordingly, Defendant's evidentiary objection is without merit and we find no error with the trial court's decision to allow Officer T.L.'s testimony into evidence.

## C. Attempt to Impeach Officer T.L.'s Testimony

The third and final question presented to this Court by Defendant's appeal is whether the trial court committed reversible error by not allowing Defendant to impeach Officer T.L.'s testimony by inquiring on cross-examination into his termination from the police department.[5] During a voir dire offer of proof, it was revealed that Officer T.L. was terminated from the Pembroke Police Department in 2009 for allegedly mishandling evidence.[6] Defendant contends that mishandling evidence is relevant to Officer T.L.'s character for truthfulness. We disagree.

Pursuant to N.C. R. Evid. 608(b):

> [s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, . . . may not be proved by extrinsic evidence. They may,

---

[5] The State's objection to this line of questioning was sustained by the trial court.

[6] Specifically, Officer T.L. indicated that he was disciplined due to "missing evidence."

> however, in the discretion of the trial
> court, if probative of truthfulness or
> untruthfulness, be inquired into on cross-
> examination of the witness (1) concerning
> his character for truthfulness or
> untruthfulness . . . .

"As the rule provides, it is within the trial court's discretion to allow or disallow cross-examination of a witness about his specific acts if the acts are relevant to his character for truthfulness or untruthfulness." *State v. Hunt*, 339 N.C. 622, 658, 457 S.E.2d 276, 297 (1994). "Evidence that a witness has attempted to deceive others is among the types of conduct most widely accepted as being indicative of one's character for truthfulness or untruthfulness." *State v. Baldwin*, 125 N.C. App. 530, 535, 482 S.E.2d 1, 4 (1997) (quotation marks and citation omitted).

Here, we hold that a police officer's termination for mishandling evidence, without additional evidence of deceit, is not probative for truthfulness. Officer T.L. was terminated from his position with the Pembroke Police Department "due to missing evidence" in an unrelated case. The trial transcript reveals that defense counsel had no further information regarding Officer T.L.'s termination and no factual basis to continue questioning him about it. Moreover, even assuming error, Defendant has not established that there is a reasonable

possibility that a different result would have occurred at trial. *See* N.C. Gen. Stat. § 15A-1443(a). Accordingly, we find no error in the decision of the trial court denying Defendant the opportunity to question Officer T.L. about his termination from the Pembroke Police Department.

## IV. Conclusion

For the foregoing reasons, we find no error with the judgments of the trial court.

No Error.

Judges ROBERT C. HUNTER and CALABRIA concur.

Report per rule 30(e).