IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA19-752

Filed: 21 April 2020

Franklin County, Nos. 15CRS438, 15CRS51242, 15CRS51248, 16CRS544, 16CRS636, 17CRS250

STATE OF NORTH CAROLINA

v.

GARRY ARITIS YARBOROUGH, Defendant.

Appeal by Defendant from judgments entered 2 August 2018 by Judge David T. Lambeth, Jr., in Franklin County Superior Court. Heard in the Court of Appeals 18 March 2020.

*Attorney General Joshua H. Stein, by Assistant Attorney General Joseph L. Hyde, for the State.*

*Appellate Defender Glenn Gerding, by Assistant Appellate Defender Amanda S. Hitchcock, for Defendant-Appellant.*

INMAN, Judge.

Defendant Garry Aritis Yarborough ("Defendant") appeals from his convictions following jury verdicts finding him guilty of first-degree murder, attempted first-degree murder, first-degree kidnapping, assault with a deadly weapon inflicting serious injury, assault with a deadly weapon with intent to kill, two counts of discharging a firearm into occupied property, felony breaking or entering, and possession of a firearm by a felon. Defendant argues that the trial court erred by : (1) joining his charges for a single trial, or, in the alternative, that his counsel was

ineffective; (2) allowing a lay witness to testify about his medical condition; (3) denying Defendant's motion to dismiss the attempted first-degree murder charge for lack of sufficient evidence of malice, premeditation, and deliberation; (4) instructing the jury on attempted first-degree murder in a misleading manner that lowered the State's burden of proof; and (5) denying defense counsel's request for a self-defense instruction. After careful review, we hold Defendant has failed to demonstrate prejudicial error and dismiss his claim of ineffective assistance of counsel without prejudice to allow him to file a motion for appropriate relief in the trial court.

## I. **FACTUAL AND PROCEDURAL HISTORY**

The evidence introduced at trial tends to show the following facts:

Defendant and his girlfriend, Tracy Williams ("Williams"), met around 2009 or 2010 while Defendant was in prison for manslaughter. The two continued their relationship after Defendant was released in 2010. By March 2014, their relationship became volatile and they would cycle between living together and apart. Beginning in April 2015, Defendant was charged with misdemeanor assault and kidnapping Williams when he allegedly prevented her from leaving his residence in Zebulon. In early July 2015, Williams obtained an *ex parte* domestic violence protective order against Defendant.[1]

---

[1] At trial, Defendant presented evidence that Williams was exaggerating these experiences to extort him for money. Defendant testified that at one point he withdrew $20,000 from his business account to pay Williams to drop the charges.

On 17 July 2015, Defendant and Williams, driving separate vehicles, stopped next to each other at an intersection in Franklinton. Williams suspected that Defendant had been following her. Defendant told Williams that "he could put his hands on her at any time he wanted to." Williams then fired two shots from her handgun into the back window of Defendant's vehicle—Defendant was not injured.

On 26 July 2015, Williams stopped her vehicle at an ATM in a Food Lion parking lot in Franklinton Square. Moments later, Defendant arrived in a black SUV and parked behind Williams' vehicle. Defendant had a handgun tucked in his waist. The two started arguing while Williams was sitting in her vehicle and Defendant was beside her kneeling down. The two got into a physical altercation, and Williams then drew her handgun and shot Defendant in the leg. She attempted to fire the gun a second time, but the gun jammed. Williams threw the gun at Defendant and ran away, screaming for help. Defendant chased after Williams while he loaded the magazine in his handgun. Williams attempted to get into the driver's seat of the black SUV, but Defendant caught up to her, pushed her head down, and fatally shot her in the back of her head. Defendant then threw Williams out of the vehicle, drove out of the parking lot, and ran over her body in the process.[2]

Defendant fled and made his way to the residence of Kim Elmore ("Elmore"), a registered nurse, parking the SUV in her backyard rather than in the driveway.

---

[2] Though the medical examiner testified that there was no evidence Williams was run over, all three witnesses who observed the incident testified that Defendant drove over Williams' body.

Defendant repeatedly rang the doorbell and knocked on the door to get Elmore's attention. Elmore opened the front door a few inches and recognized Defendant as the repairmen who had worked on her air conditioning unit a few months earlier. Elmore tried to shut the door, but Defendant pushed his way in and asked if anyone else was home. When Elmore told Defendant to leave, he pointed a handgun to her forehead and said that he would kill her. Defendant then struck Elmore twice over the head with the butt of his gun, causing her to bleed profusely.

Defendant asked Elmore for band-aids and towels. Although Defendant's leg wound was not bleeding, he wanted Elmore to provide a tourniquet for his leg and bandage the wound. While Elmore was working on Defendant's leg, Defendant called and talked to an acquaintance on the phone. Elmore overheard Defendant "saying something about a van, that he had killed [Williams], and he had a hostage." Elmore begged Defendant not to kill her, and he told her that "if [she] did what he said, he would just leave [her] there tied up," despite saying on the phone that he had a hostage.

After Elmore finished, Defendant got up and told her that they were leaving. While the two were heading to the front door, Elmore said she was going to turn the lights off. As Defendant crossed the door and stepped outside, Elmore quickly shut the door and locked it. Defendant then turned around and fired four to six shots near the doorknob and kicked and yelled at the door. Elmore ran to the bathroom and

- 4 -

called 911 and Defendant drove from the scene. Defendant was later found and arrested in a hotel in Raleigh.

Defendant was indicted for first-degree murder, attempted first-degree murder, first-degree kidnapping, felony breaking or entering, assault with a deadly weapon inflicting serious injury, assault with a deadly weapon with intent to kill, burning personal property, possession of a firearm by a felon, and two counts of discharging a weapon into occupied property. In October 2017, the State filed a motion to join all of Defendant's charges for a single trial.

Defendant's charges came on for trial on 9 July 2018. Both the State and defense counsel presented expert witness testimony regarding Defendant's mental state at and around the time of the alleged crimes. Following the State's evidence, defense counsel motioned to dismiss all of Defendant's charges for lack of evidence. The trial court dismissed the burning personal property charge and denied the remainder of defense counsel's motion. At the close of all the evidence, the trial court denied defense counsel's renewed motion to dismiss all remaining charges. The jury found Defendant guilty on all counts.

The trial court sentenced Defendant to life imprisonment without parole for first-degree murder and entered consolidated judgments imposing consecutive prison terms: 238-298 months for attempted first-degree murder; 110-144 months for first-degree kidnapping, felony breaking or entering, and assault with a deadly

weapon inflicting serious injury; 97-129 months for two counts of discharging a weapon into occupied property; 38-58 months for assault with a deadly weapon with intent to kill; and 19-32 months for possession of a firearm by a felon.

Defendant gave oral notice of appeal.[3]

## II. <u>ANALYSIS</u>

### A. *Joinder of Charges*

On the first day of trial, before jury selection, defense counsel objected to the State's motion for joinder, contending that his charges should be severed. Following arguments, the trial court orally granted the State's motion (and later via written order). Defendant contends the trial court erred in granting the State's motion. We disagree.

Multiple offenses may be joined for one trial so long as they "are based on the same act or transaction or on a series of acts or transactions connected together or constituting parts of a single scheme or plan." N.C. Gen. Stat. § 15A-926(a) (2017). In concluding whether consolidation was appropriate, we review whether: (1) there is a transactional connection among the offenses; and (2) "the accused can receive a fair hearing on more than one charge at the same trial." *State v. Silva*, 304 N.C. 122, 126, 282 S.E.2d 449, 452 (1981). While a transactional connection between the offenses is

---

[3] As an initial matter, we hold that all of Defendant's constitutional claims embedded in his arguments on the same issues are unpreserved and we will not address them on appeal. *See State v. Lloyd*, 354 N.C. 76, 86-87, 552 S.E.2d 596, 607 (2001) ("Constitutional issues not raised and passed upon at trial will not be considered for the first time on appeal.")

a question of law reviewable on appeal, the decision to join the offenses for one trial, *i.e.*, determining "whether consolidation hinders or deprives the accused of his ability to present his defense," is within "the sound discretion of the trial judge." *State v. Montford*, 137 N.C. App. 495, 498, 529 S.E.2d 247, 250 (2000) (quotation marks and citations omitted).

Section 15A-927 of our General Statutes requires a criminal defendant to file a motion to sever charges prior to trial or, if the grounds for severance are not known before trial, file a motion to sever no later than the close of the State's evidence. N.C. Gen. Stat. §§ 15A-927(a)(1)-(2) (2017). A defendant waives his right to severance "if the motion is not made at the appropriate time." *Id.* § 15A-927(a)(1); *see also State v. Walters*, 357 N.C. 68, 79-80, 588 S.E.2d 344, 351 (2003) (dismissing the defendant's severance issue due to his trial counsel's failure to file any motion for severance). Here, Defendant made no motion to sever, either before or during trial, but merely objected to the State's motion for joinder. Defendant now asks this Court to exercise its discretion under Rule 2 of our Rules of Appellate Procedure to review this issue. N.C. R. App. P. 2 (2020). We decline to do so.

Defendant requests, in the event we hold he has waived this issue for appellate review, that we consider whether he received ineffective assistance of counsel ("IAC").

We decline to address this issue on direct appeal, as it is more appropriate for Defendant to file a motion for appropriate relief ("MAR"). Though this court can

review IAC claims on direct appeal, we can do so only if we can decide the issue from the record on appeal without further investigation. *State v. Thompson*, 359 N.C. 77, 122-23, 604 S.E.2d 850, 881 (2004). Because the record is silent as to Defendant's counsel's reasoning in declining to file a motion to sever, we dismiss his IAC claim without prejudice so he can file a MAR in the trial court.

## B. *Lay Witness Testimony*

Defendant next argues that the trial court erred in allowing Elmore, a lay witness, to offer expert medical testimony regarding his mental capacity. We review the trial court's admission of lay witness opinion testimony for abuse of discretion. *State v. Sharpless*, 221 N.C. App. 132, 137, 725 S.E.2d 894, 898 (2012).

During direct examination, Elmore, a registered nurse, testified as follows:

> [STATE:] In the five to ten minutes, give or take a few minutes on either side of that, did you believe that in your time—let me—did you believe that [Defendant] was not in touch with reality?
>
> [ELMORE:] No, he knew what he was doing.
>
> [STATE:] And why do you say that?
>
> [ELMORE:] Because of the steps. Cognitively—
>
> [Objection overruled]
>
> [ELMORE:] In my experience as a nurse, I have seen a lot.
>
> [Objection]

After defense counsel's last objection, a *voir dire* hearing was held outside the presence of the jury to determine whether Elmore's testimony went beyond that of a lay witness. Defense counsel did not object to Elmore's statement that Defendant "knew what he was doing," but to Elmore's conclusions from her observations "based upon her experience and training" as a nurse. The trial court sustained defense counsel's objection and instructed the prosecutor to continue questioning without asking Elmore for a medical opinion. The trial court then instructed the jury to disregard Elmore's statement "dealing with cognitive steps" that Defendant may have taken.

On redirect examination, the prosecutor elicited the following testimony from Elmore:

> [STATE:] Have you dealt with psych patients?
>
> [ELMORE:] Oh, yes.
>
> [STATE:] And how would you compare [Defendant's] behavior on that day to psych patients that you've dealt with?
>
> [Objection overruled]
>
> [STATE:] You can answer that, ma'am, yes.
>
> [ELMORE:] Psych patients, they're just a different breed. They're just not in touch with reality. They have trouble processing their thoughts.
>
> [Objection overruled]

[ELMORE:] They have trouble going through steps, processing their thoughts. They just have trouble functioning cognitively and physically and . . . .

[STATE:] So was that what you saw in [Defendant] or did you see something different in him?

[ELMORE:] I saw evil, mean.

[Objection overruled]

[STATE:] Was he able to process his thoughts?

[ELMORE:] Yes.

[STATE:] Was he in touch with reality?

[ELMORE:] Yes.

[Objection sustained]

[STATE:] Was there ever a time in your observations that you believed he did not know what was going on?

[ELMORE:] No.

Rule 701 of the North Carolina Rules of Evidence provides that non-expert testimony "is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue." N.C. Gen. Stat. § 8C-1, Rule 701 (2017). While lay witnesses with personal knowledge of a person's mental state can "give an opinion as to an emotional state of another," they "may not offer a specific psychiatric diagnosis of a person's mental condition." *State v. Storm*, 228 N.C. App. 272, 277-78,

743 S.E.2d 713, 717 (2013) (citations omitted); *see also State v. Davis*, 349 N.C. 1, 30, 506 S.E.2d 455, 471 (1998) (affirming the trial court's decision prohibiting lay witness testimony regarding whether the defendant "appeared to be psychotic").

Defendant contends that the trial court erroneously allowed Elmore to testify that he was "able to process his thoughts," was "in touch with reality," and could "function[] cognitively and physically." Defendant further asserts that, because the key issue at trial was his ability to formulate the specific intent element of the charges, he was prejudiced by Elmore's impermissible lay testimony, because the State's and Defendant's respective expert witnesses "largely canceled out the testimony of the other."

The State argues that any error resulting from Elmore's challenged testimony was invited by defense counsel, who cross-examined Elmore about her prior statements to police comparing Defendant to a "psych patient."

Assuming *arguendo* that the alleged error was not invited, Defendant cannot demonstrate that, but for the impermissible testimony, "there is a reasonable possibility that . . . a different result would have been reached at trial." *Storm*, 228 N.C. App. at 278, 743 S.E.2d at 718 (quoting N.C. Gen. Stat. § 15A-1443(a) (2011)).

The State introduced an abundance of evidence showing that Defendant intended to commit the crimes in question. Following a brief physical altercation with Williams in the parking lot, Defendant chased after a defenseless Williams while

reloading his handgun, grabbed and held her down, and shot her in the back of the head. Defendant then drove directly to Elmore's residence. Defendant was not a friend of Elmore's but knew she was a nurse. Instead of parking in Elmore's driveway, Defendant parked the black SUV in the backyard. Defendant first asked her if anyone was home. He then pointed the gun at her head and demanded that she attend to his gunshot wound or else he would kill her. Defendant reported to someone on the phone that he had shot Williams and had a hostage. Elmore also testified, in non-medical terms, that Defendant seemed as if he understood what he was doing. Considering this evidence, we are unable to conclude that, had the trial court excluded Elmore's alleged improper medical opinion testimony, there is a reasonable possibility the result of any of Defendant's charges would have been different.

## C. *Sufficiency of the Evidence*

Defendant contends that the trial court erred in denying his motion to dismiss the attempted first-degree murder charge because the State did not establish that he acted with malice and premeditation and deliberation. We disagree.

When reviewing a trial court's denial of a motion to dismiss for sufficiency of the evidence, our standard of review is well-known:

> The standard for ruling on a motion to dismiss is whether there is substantial evidence (1) of each essential element of the offense charged and (2) that defendant is the perpetrator of the offense. Substantial evidence is relevant

> evidence which a reasonable mind might accept as adequate to support a conclusion. In ruling on a motion to dismiss, the trial court must consider all of the evidence in the light most favorable to the State, and the State is entitled to all reasonable inferences which may be drawn from the evidence. Any contradictions or discrepancies arising from the evidence are properly left for the jury to resolve and do not warrant dismissal.

*State v. Wood*, 174 N.C. App. 790, 795, 622 S.E.2d 120, 123 (2005) (quotation marks and citations omitted). We review a denial of a motion to dismiss *de novo*. *State v. Cox*, __ N.C. App. __, __, 825 S.E.2d 266, 268 (2019).

To prove attempted first-degree murder, the State must demonstrate that the defendant (1) had the specific intent to kill another; (2) performed an overt act calculated to carry out that intent, going beyond mere preparation; and (3) acted with malice and premeditation and deliberation. *State v. Tirado*, 358 N.C. 551, 579, 599 S.E.2d 515, 534 (2004) (citing N.C. Gen. Stat. § 14-17 (2003)). Premeditation is an act "thought out beforehand for some length of time, however short, but no particular amount of time is necessary." *State v. Cozart*, 131 N.C. App. 199, 202, 505 S.E.2d 906, 909 (1998). Deliberation "means an intent to kill, carried out in a cool state of blood, in furtherance of . . . an unlawful purpose and not under the influence of a violent passion, suddenly aroused by lawful or just cause or legal provocation." *Id.* Malice is "not only hatred, ill-will, or spite, as it is ordinarily understood, but it also means that condition of mind which prompts a person to take the life of another intentionally without just cause, excuse, or justification." *State v. Tilley*, 18 N.C. App.

300, 302, 196 S.E.2d 816, 818 (1973). Malice and premeditation and deliberation, in the context of attempted first-degree murder, "may be inferred from the conduct and statements of the defendant before and after the incident, ill-will or previous difficulty between the parties, and evidence regarding the manner of the attempted killing." *State v. Peoples*, 141 N.C. App. 115, 118, 539 S.E.2d 25, 28 (2000).

Construing all evidence and inferences in favor of the State, we hold the State presented sufficient evidence for the jury to reasonably conclude that Defendant attempted to kill Elmore with malice and premeditation and deliberation. Defendant told Elmore he would kill her if she did not follow his commands, he struck her over the head twice with his handgun, and he stated on the phone that he had a hostage. When Elmore tried to escape by shutting the front door, Defendant shot the door near the doorknob four to six times before kicking the door and yelling. Although Defendant argues he fired because he was startled and did not know Elmore was behind the door, we have consistently held that contradictions and alternative hypotheses are for the jury to weigh and resolve. *See, e.g.*, *State v. Stone*, 323 N.C. 447, 452, 373 S.E.2d 430, 433 (1988).

### D. *Malice Instruction*

Defendant argues the trial court committed prejudicial error by instructing the jury regarding the malice element of attempted first-degree murder as follows:

> If the State proves beyond a reasonable doubt that the defendant *intentionally inflicted a wound upon the victim*

- 14 -

*with a deadly weapon, you may infer first, that the defendant acted unlawfully and second, that it was done with malice*, but you are not compelled to do so. You may consider this along with all other facts and circumstances in determining whether the defendant acted unlawfully and with malice.

(emphasis added). Defendant contends the italicized portion of the instruction could have misled the jury by effectively lowering the State's burden of proof. Defendant contends that there was no evidence that his shots hit Elmore when he fired into her front door and that the jury could not infer malice from his twice pistol-whipping her.

Defendant cannot demonstrate prejudicial error. We have held that, "in the context of attempted first degree murder, the intentional use of a deadly weapon itself gives rise to a presumption that the act was undertaken with malice." *Peoples*, 141 N.C. App. at 118, 539 S.E.2d at 28-29 (citation omitted). Malice may also be inferred by other circumstances including "(1) lack of provocation by the intended victims; (2) conduct and statements of the defendant both before and after the attempted killing; [and] (3) threats made against the intended victims by the defendant." *State v. Teague*, 216 N.C. App. 100, 106-07, 715 S.E.2d 919, 924 (2011). Given Defendant's use of a deadly weapon and these three additional circumstances, we are unpersuaded that, absent the argued instructional component, there is a reasonable possibility that the jury would have reached a different verdict on the charge of attempted first-degree murder.

### E. Self-Defense Instruction

Defendant finally argues that the trial court committed prejudicial error in its instruction to the jury regarding the first-degree murder charge by failing to include an instruction on self-defense.  We disagree.

> Our Court reviews a trial court's decisions regarding jury instructions *de novo*.  The trial court must instruct the jury on self-defense if there is any evidence in the record from which it can be determined that it was necessary or reasonably appeared to be necessary for defendant to kill his adversary in order to protect himself from death or great bodily harm.  Moreover, the trial court must provide a self-defense instruction if the above criteria is met even though there is contradictory evidence by the State or discrepancies in the defendant's evidence.  With regard to whether a defendant is entitled to a jury instruction on self-defense, the trial court must consider the admissible evidence in the light most favorable to the defendant.

*State v. Cruz*, 203 N.C. App. 230, 235, 691 S.E.2d 47, 50-51 (2010) (quotation marks, citations, and alterations omitted).

Here, the trial court declined Defendant's request for a jury instruction on both perfect and imperfect self-defense.  A perfect self-defense instruction is warranted if the following elements are established:

> (1) [I]t appeared to defendant and he believed it to be necessary to kill the deceased in order to save himself from death or great bodily harm; and
>
> (2) defendant's belief was reasonable in that the circumstances as they appeared to him at the time were sufficient to create such a belief in the mind of a person of ordinary firmness; and

(3) defendant was not the aggressor in bringing on the affray, *i. e.*, he did not aggressively and willingly enter into the fight without legal excuse or provocation; and

(4) defendant did not use excessive force, *i. e.*, did not use more force than was necessary or reasonably appeared to him to be necessary under the circumstances to protect himself from death or great bodily harm.

*State v. Norris*, 303 N.C. 526, 530, 279 S.E.2d 570, 572-73 (1981) (citations omitted). But if the defendant, "although without murderous intent, was the aggressor in bringing on the difficulty, or [he] used excessive force," then he is only eligible for an imperfect self-defense instruction and "is guilty at least of voluntary manslaughter." *Id.* at 530, 279 S.E.2d at 573 (citations omitted).

Consequently, "for defendant to be entitled to an instruction on self-defense, the following questions must be answered affirmatively: (1) Is there evidence that the defendant in fact formed a belief that it was necessary to kill his adversary in order to protect himself from death or great bodily harm, and (2) if so, was that belief reasonable?" *State v. Meadows*, 158 N.C. App. 390, 401, 581 S.E.2d 472, 478 (2003) (quotation marks and citation omitted).

Here, three witnesses to the confrontation between Williams and Defendant in the parking lot testified that immediately after Williams shot Defendant in the leg, her handgun jammed, she threw it at Defendant, and she attempted to flee from him while screaming for help. Defendant then ran after her, reloaded his own handgun, and proceeded to grab Williams and fire a bullet into the back of her head. Assuming

Defendant reasonably believed it was necessary to defend himself with deadly force when Williams shot him, that belief could not have remained reasonable after Williams' handgun jammed and she threw it at Defendant and ran away.

Defendant testified that he "was in fear for [his] life" when Williams shot him in the leg, but that he did not remember chasing or shooting Williams after that. Defendant's expert witness testified that Defendant was acting instinctively and involuntarily due to his preexisting psychological conditions, including intermittent bouts of amnesia.

Defendant's testimony that he does not recall shooting Williams, combined with his expert's testimony that Defendant acted involuntarily, defeat his self-defense argument. *See State v. Cook*, 254 N.C. App. 150, 153, 802 S.E.2d 575, 577 (2017) ("[O]ur Supreme Court has repeatedly held that a defendant who fires a gun in the face of a perceived attack is not entitled to a self-defense instruction if he testifies that he did not intend to shoot the attacker when he fired the gun." (citation and emphasis omitted)); *State v. Hinnant*, 238 N.C. App. 493, 496, 768 S.E.2d 317, 320 (2014) ("[T]he testimony of a witness stating that it was reasonable for the defendant to believe deadly force was necessary was irrelevant where the defendant himself testified that he did not intend to shoot anyone when he fired his weapon." (citation omitted)). Consistent with the defense evidence, the trial court instructed the jury that it could not find Defendant guilty if it found he was not able to exercise

voluntary control of his actions. *See State v. Boggess*, 195 N.C. App. 770, 772, 673 S.E.2d 791, 793 (2009) ("[T]he absence of consciousness not only precludes the existence of any specific mental state, but also excludes the possibility of a voluntary act without which there can be no criminal liability." (quotation marks and citation omitted)).

Based on all of the evidence, considered in the light most favorable to Defendant, we conclude that the trial court did not err in its instruction. Also, the undisputed evidence that Defendant chased Williams when she was unarmed, grabbed her, and shot her in the back of the head precludes Defendant's argument that, had the instruction been given, there is a reasonable possibility the jury would not have found him guilty of first-degree murder.

### III. <u>CONCLUSION</u>

For the foregoing reasons, Defendant has failed to demonstrate prejudicial error as to any of his issues on appeal. We dismiss his IAC claim without prejudice to allow him to file a MAR in the trial court.

NO ERROR IN PART; DISMISSED WITHOUT PREJUDICE IN PART.

Judges ZACHARY and YOUNG concur.